MICHAEL DOMINGUES, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 26562

May 30, 1996                                    917 P.2d 1364

*Morgan D. Harris,* Public Defender and *Robert L. Miller,* Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

**OPINION**

By the Court, SHEARING, J.:

On the evening of October 22, 1993, Arjin Chanel Pechpo and her four-year old son, Jonathan Smith, were murdered in their home in Las Vegas, Nevada. Appellant Michael Domingues waited for Pechpo behind her front door; when she entered with Jonathan, Domingues threatened her with a gun, tied up her hands, and strangled her with a cord. Domingues then dragged Pechpo's body to the bathtub, filled it with water, ordered Jonathan to get into the tub, and threw a hair dryer into the tub in an attempt to electrocute the boy. When the electrocution attempt failed, Domingues stabbed Jonathan with a knife numerous times, killing him.

The police investigation did not link Domingues to the crimes until November 19, 1993, when police learned that Domingues had used Pechpo's credit card by forging her name to purchase several items at a local Target department store. In relation to the Target incident, Domingues's accomplice and friend, Joshua Rodgers, explained that Domingues commented that he had strangled a woman because she was yelling at his then-girlfriend, Michelle Fleck ("Michelle"). At a subsequent interview in November 1993, Domingues admitted to police only that he entered the house, stole the credit card and used it at the Target store.

On January 3, 1994, the police received a call from Paul Fleck, Michelle Fleck's father, and the next-door neighbor to the Pechpo residence. When police later met with Fleck, he turned over a television set and a VCR, as well as other items reported to have belonged to Arjin Pechpo. On January 4, 1994, the police returned to the Fleck residence and spoke with Michelle. During this interview, Michelle fully implicated Domingues in the murders. Her statement included crime details which had not been previously released to the media or to any private citizens, including the victims' family.

Michelle related that approximately two weeks prior to the murders, Domingues told her that he wanted to steal a car from a particular person living in the neighborhood and that he wanted to beat them up and kill them if they put up a fight. Three days before the murders, Michelle saw Domingues braiding some cord similar to that used by her father in his plumbing business. Thereafter, on the night of October 22, 1993, Michelle recalled that Domingues had come to her window dressed entirely in black—a black-hooded shirt over a long-sleeved black shirt and

black sweat pants. After Michelle climbed out of the window, Domingues pointed to a burgundy car and asked her, "How do you like my new car?" When Michelle asked Domingues where he had gotten the car, he replied that he had killed the woman next door, pointing to the Pechpo home. At this point, Michelle did not know whether or not to believe Domingues's declaration.

Domingues explained that they were going to California, and Michelle got into the car, which she later identified as belonging to Pechpo. Michelle noticed a plastic bag containing a knife, some yellow rope and an open wallet on the floor of the vehicle. She recognized the knife as one from her kitchen. Michelle also saw a gun and recognized it as belonging to her father. After some time, Michelle informed Domingues that she needed to use the restroom. Domingues exited the freeway, and Michelle explained that she wanted to go home. Domingues began yelling, "I did it for you." On the way back to Las Vegas, Domingues kept saying to Michelle that he had strangled "her." At a trailer park, Domingues stopped the car and discarded some of the black clothes he was wearing, a plastic grocery sack, some cord, the wallet and a child's car seat into a trash dumpster. Domingues explained that he was getting "rid of evidence." Domingues did not throw away the knife. When the couple returned to Michelle's house, Domingues directed her to wash the knife with bleach. Michelle washed the knife noticing that it had blood on it.

Summarizing various discussions she had with Domingues that night, Michelle recounted Domingues's admissions about the crimes. Domingues gained access to Arjin Pechpo's house by breaking the kitchen window. He waited behind the door for Pechpo to come home. Domingues stated that he was waiting for her so that he could kill her and steal her car. When Pechpo and her son entered the house, Domingues placed a gun to Pechpo's head and ordered her to lie down. Thereafter, he tied her hands with the cord Fleck later saw in the car and strangled her with the cord. Domingues then dragged Pechpo's body to the bathroom and put her in the tub. Domingues then instructed the little boy, Jonathan, to take off his pants and get into the tub. He handed the boy a hair dryer in an effort to electrocute him. When this proved ineffective, Domingues stabbed the boy repeatedly with Fleck's kitchen knife.

Domingues stayed the night with Michelle. The next morning, October 23, 1993, Michelle noticed a cut on Domingues's finger. When Fleck asked what had happened, Domingues explained that the injury occurred as he was choking the woman. Michelle related that after the murders, Domingues had brought her a television set and two VCRs and intended them to be payment to her father for a phone bill. He also brought her jewelry, hair curlers, curling irons, a dress, some belts and a black teddy bear.

After her January 4, 1994, interview with the police, most of these items were turned over to the police. Michelle also turned over the knife and the black-hooded T-shirt Domingues had worn.

Michelle acknowledged that she initially gave false information to the police by telling them that she had seen a car with some black men speed away on the night of the murders. She also explained that she was extremely afraid of Domingues in that he "told me if I told anybody he would kill my whole family in front of me. He would tie me up and then torture me until I die."

After the January 4, 1994, interview, police arrested and charged Domingues with first degree murder for Pechpo's death, first degree murder with the use of a deadly weapon for Jonathan's death, robbery with use of a deadly weapon, and burglary. After a trial, the jury found Domingues guilty of all crimes charged. After a penalty hearing, Domingues was sentenced to death for each of the murder counts, two consecutive fifteen-year terms of imprisonment for robbery with use of a deadly weapon, and ten years of imprisonment for the burglary.

On appeal, Domingues first argues that the district court erred in denying his pre-trial petition for writ of habeas corpus, in that insufficient evidence existed to support use of a deadly weapon for the robbery and murder charges in light of the "corpus delicti rule." Specifically, Domingues argues that there is absolutely no proof, independent of his own admissions to Michelle Fleck, that either a gun or a knife was used in either the killing or robbery of Pechpo. He contends that because the deadly weapon enhancement was appended to the robbery and murder counts, use of a deadly weapon became an element of each offense. Domingues claims that the "corpus delicti rule" precluded consideration of his admissions at the preliminary hearing as sufficient evidence to support a finding of probable cause for each offense.

To hold a criminal defendant for trial, there must be probable cause to believe that a crime was committed and that the defendant was the one who committed it. Azbill v. State, 84 Nev. 345, 350-51, 440 P.2d 1014, 1017 (1968). "In determining whether a crime has been committed, two elements, i.e., the corpus delicti, must be established." Sheriff v. Larsgaard, 96 Nev. 486, 488, 611 P.2d 625, 626 (1980). "The corpus delicti of murder are (1) the fact of death, and (2) a criminal agency of another responsible for that death." Id. (citing Hicks v. Sheriff, 86 Nev. 67, 464 P.2d 462 (1967)). According to the corpus delicti rule, only after the corpus delicti is determined by lawful evidence may the defendant's admissions be considered in establishing whether it was the defendant who committed the crime. State, Dep't of Mtr.

Vehicles v. McLeod, 106 Nev. 852, 855, 801 P.2d 1390, 1392 (1990).

We disagree with Domingues's argument because the corpus delicti rule is inapplicable to a deadly weapon sentencing enhancement. The purpose of the corpus delicti rule is to establish that an injury or crime in fact occurred. A sentencing enhancement is merely an additional penalty for the primary offense. NRS 193.165(2), the statute providing for a sentencing enhancement when a deadly weapon is used, states in pertinent part:

> This section does not create any separate offense but provides an additional penalty for the primary offense, whose imposition is contingent upon the finding of the prescribed fact.

The corpus delicti rule asks a more fundamental question: Did a death occur and was it by means of criminal agency? According to Wigmore:

> The meaning of the phrase *corpus delicti* has been the subject of much loose judicial comment, and an apparent sanction has often been given to an unjustifiably broad meaning. It is clear that an analysis of every crime, with reference to this element of it, reveals component parts, *first,* the *occurrence* of the specific injury or loss (as, in homicide, a person deceased; in arson, a house burnt; in larceny, property missing); *second,* somebody's criminality (in contrast, e.g., to accident) as the source of the loss-these two together involving the commission of a crime by *somebody.*

7 John Henry Wigmore, *Evidence* § 2072 (1970). The aim of the corpus delicti rule is to protect against an accused's conviction based solely upon an uncorroborated confession. *Id.* Corpus delicti requires the prosecutor to show, for example, that a person died as a result of murder, rather than as a result of an accident, suicide or natural causes. Whether the murder or another crime, such as robbery, was carried out with use of a deadly weapon is irrelevant to the establishment of corpus delicti. Accordingly, we conclude that Domingues's contention lacks merit.

Second, Domingues claims that there was insufficient evidence to support the jury's guilty verdict for robbery with use of a deadly weapon and murder with use of a deadly weapon. Specifically, Domingues argues that there was insufficient evidence to show that a deadly weapon was used in the commission of either

of these crimes. The standard of review for sufficiency of the evidence in a criminal case is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, after viewing the evidence in the light most favorable to the prosecution. Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984). A reviewing court will not disturb a verdict on appeal if it is supported by substantial evidence. Nix v. State, 91 Nev. 613, 614, 541 P.2d 1, 2 (1975). We conclude that sufficent evidence was presented at trial which indicated that a deadly weapon was used in the commission of the robbery and in one murder. Michelle Fleck gave a detailed account of Domingues's use of a firearm to subdue Pechpo. Autopsy photographs admitted into evidence depicted the brutally stabbed body of Jonathan Smith. Thus, sufficient evidence of use of a knife in the commission of the murder[1] and use of a firearm in the commission of the robbery was presented.

Third, Domingues contends that the district court erred in admitting Detective Ziola's testimony regarding the condition of the bedroom window at the Pechpo residence as it appeared immediately prior to trial. Although this evidence appears to be irrelevant and therefore inadmissible, we conclude that its admission was harmless beyond a reasonable doubt in light of the overwhelming evidence of Domingues's guilt as to the murders, robbery and burglary. NRS 178.598; Chapman v. California, 386 U.S. 18 (1966).

Fourth, Domingues asserts that the district court abused its discretion in limiting Detective Ziola's testimony regarding his interview with Domingues in relation to the Target store incident. Specifically, Domingues asserts that the district court erred in

---

[1] A knife is not necessarily a deadly weapon under NRS 193.165. Milton v. State, 111 Nev. 1487, 908 P.2d 684 (1995). Here, the jury had the opportunity to view the knife that was used as the murder weapon. The jury received the proper instruction for determining whether the knife was inherently dangerous as required by Zgombic v. State, 106 Nev. 571, 798 P.2d 548 (1990). It determined that the knife was a deadly weapon after applying the inherently dangerous test.

However, even assuming that the knife was not inherently dangerous, the finding that a deadly weapon was used in the murder did not prejudice Domingues because his murder sentence was not enhanced as a result. The jury sentenced Domingues to death for the murder, not a term of imprisonment. When a deadly weapon is used to commit the crime of murder, NRS 193.165(1) provides an additional term of *imprisonment* equal to the term prescribed for the underlying crime. Here, there was no term of imprisonment imposed for the underlying crime, and therefore, no additional term was assigned.

allowing Detective Ziola to testify only to certain statements Domingues made during that interview but expressly excluding Domingues's admission that he stole Pechpo's credit card after the conclusion of the police investigation. We agree. NRS 47.120 provides, "[w]hen any part of a writing or recorded statement is introduced by a party, he may be required at that time to introduce any other part of it which is relevant to the part introduced, and any party may introduce any other relevant parts. This section does not limit cross-examination." Here, the State introduced portions of Domingues's admissions to police during his interview through its direct examination of Detective Ziola. Yet, the district court prohibited defense counsel from cross-examining Detective Ziola regarding Domingues's admission that he entered the Pechpo residence after the murders to steal the credit card. Pursuant to NRS 47.120, defense counsel was permitted to introduce any other relevant parts of Domingues's statement. Thus, the district court erred in prohibiting defense counsel from presenting this evidence. However, in light of the overwhelming evidence proving that Domingues is guilty of committing the murders, we hold that this error was harmless. NRS 178.598.

Fifth, Domingues argues that the district court abused its discretion in admitting Paul Fleck's testimony regarding Domingues's taking up residence in his attic and Domingues's threats to his family, especially Michelle. The decision to admit or exclude evidence of separate and independent offenses rests within the sound discretion of the trial court and will not be disturbed unless it is manifestly wrong. Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985). It is the trial court's duty to strike a proper balance between the probative value of the evidence and its prejudicial dangers. Elsbury v. State, 90 Nev. 50, 518 P.2d 599 (1974). We conclude that the district court did not abuse its discretion in determining that this evidence was admissible under NRS 48.045(2) because it was germane to issues other than Domingues's character or criminal disposition. It was specifically probative of Michelle's credibility and her reason for delay in reporting Domingues's confession to the police, which was a central issue in both the prosecution and the defense cases. Here, Paul Fleck testified that he ejected Domingues from his home after he discovered that Domingues had taken up residence in his attic. Paul Fleck's descriptions were simply part of his story as to how he discovered Domingues in his home and the confrontation that ensued including Domingues's threats to Michelle. We further conclude that Domingues's residence in the Fleck home was

more probative than prejudicial on the issue of Michelle's credibility and Domingues's intimidation of her.

Sixth, Domingues asserts that the district court abused its discretion in denying his motion for a mistrial based on Michelle's remarks at trial that Domingues had eluded law enforcement in the past. "The decision to grant or deny a motion for a new trial rests within the sound discretion of the trial court and will not be disturbed on appeal absent palpable abuse." Pappas v. State, Dep't Transp., 104 Nev. 572, 574, 763 P.2d 348, 349 (1988). We conclude that the district court did not abuse its discretion because the statements were spontaneously uttered, and there was no bad faith on the part of the prosecution regarding their elicitation. In light of the other admissible evidence that Domingues had several encounters with law enforcement officials, the admission of these statements was harmless beyond a reasonable doubt.

Seventh, Domingues contends that the district court erred in prohibiting evidence of Pechpo's ex-husband's polygraph test results. Absent a written stipulation, polygraph evidence is properly excluded. Corbett v. State, 94 Nev. 643, 584 P.2d 704 (1978). Here, the parties did not stipulate to the admission of the polygraph examination. Therefore, Domingues's contention lacks merit.

Eighth, Domingues argues that the district court abused its discretion in admitting into evidence autopsy and crime scene photographs. Admissibility of photographs lies within the sound discretion of the district court and, absent an abuse of that discretion, the decision will not be overturned. Ybarra v. State, 100 Nev. 167, 172, 679 P.2d 797, 800, cert. denied, 470 U.S. 1009 (1984). "Color photographs of a victim used by a doctor to explain the cause of death to a jury are properly admissible because they aid in the ascertainment of truth." Allen v. State, 91 Nev. 78, 82, 530 P.2d 1195, 1197 (1975). After carefully reviewing the photographs, we conclude that they were probative on the issue of the victims' causes of death, and that they were more probative than prejudicial. Accordingly, the district court did not abuse its discretion in admitting them.

Ninth, Domingues asserts that the prosecutor's statements of personal belief in closing argument at the guilt phase of trial

amounted to prosecutorial misconduct requiring reversal.[2] Statements by the prosecutor, in argument, indicative of his opinion, belief, or knowledge as to the guilt of the accused, when made as a deduction or conclusion from the evidence introduced in the trial, are permissible and unobjectionable. Collins v. State, 87 Nev. 436, 439, 488 P.2d 544, 545 (1971). The prosecutor's first comment demonstrates that he drew a conclusion of Domingues's guilt from the evidence introduced at trial, which was permissible and unobjectionable under *Collins*. The prosecutor's second set of comments that "evil is easy," that "eventually truth will come to light," and that "murder cannot be hid [sic] long," were not prejudicial because they simply echo the commonly held notion that "crime does not pay."

Tenth, Domingues claims that the district court erred in admitting evidence of Domingues's prior bad acts at the penalty hearing.[3] Evidence of a defendant's character and his record is proper

---

[2]Specifically, Domingues points to the prosecutor's following comments:

This is an adversary system. I hear Mr. Christensen [defense counsel] say he doesn't know why the prosecution even has the audacity to ask for you to convict Michael Domingues. In an adversary system, it's interesting each side always thinks the other side is audacious. Mr. Christensen, I won't disappoint you, and I will announce to the jury at the outset, it is the belief of the prosecution based upon the evidence you have heard that Michael Domingues has been proven beyond a reasonable doubt to be a killer.

. . . .

In addition to believing that evil is easy, I also happen to believe that in most instances eventually truth will come to light. Murder cannot be hid [sic] long. It was hid for a while in this case, and for a while the police focused on someone else.

[3]The State's evidence at the penalty hearing included the following: first, James Nares, a former investigator for the San Diego County Sheriff's Department, testified that Domingues caused problems at his high school and was eventually expelled. After Domingues's expulsion, Nares arrested Domingues for trespassing on school grounds.

Second, Peter Callewaert, another officer with the San Diego County Sheriff's Department, testified to an incident where he attempted to arrest Domingues pursuant to a juvenile detention order. Having been informed that Domingues might be armed, Callewaert confronted Domingues with his weapon drawn and ordered him onto the ground. Domingues ignored the order and fled, but was eventually captured. Incidental to his narration, Callewaert mentioned that he often saw Domingues walking along streets after curfew hours.

Third, Michelle testified that on one occasion, because she refused to have sex with Domingues, he grabbed both of her breasts and squeezed them with so much force that his fingers touched.

Fourth, Sheryl Beeman, Paul Fleck's girlfriend, testified to an incident she witnessed where Domingues threw a basketball with full force into Michelle's face at close range.

and permissible in a penalty phase hearing, but it must be relevant and must be more probative than prejudicial. Pellegrini v. State, 104 Nev. 625, 630-31, 764 P.2d 484, 488 (1988). The decision to admit particular evidence during the penalty phase is within the sound discretion of the trial court, and will not be overturned absent an abuse of that discretion. Milligan v. State, 101 Nev. 627, 708 P.2d 289 (1985), *cert. denied*, 479 U.S. 870 (1986). Here, there is no question that the evidence was properly admitted under *Pellegrini*. The breast squeezing incident and the basketball incident were properly admitted as relevant and more probative than prejudicial concerning Domingues's propensity for committing acts of violence. Past commission of violent acts bears on whether the death penalty is a suitable punishment. On the other hand, the evidence of trespassing on school grounds and the violation of curfew were relevant to Domingues's character but not necessarily probative of whether Domingues should receive a death sentence. However, this testimony was not highly prejudicial and the district court did not abuse its discretion by admitting it.

Eleventh, Domingues contends that the district court erred in admitting testimony at the penalty hearing from a state's witness whose name did not appear on the pre-trial endorsement list. The State's ability to endorse additional witnesses rests within the sound discretion of the trial court, and its ruling will not be disturbed on appeal in the absence of a showing of an abuse of discretion. Hess v. State, 73 Nev. 175, 179, 313 P.2d 432, 433 (1957). In State v. Teeter, 65 Nev. 584, 200 P.2d 657 (1948), this court stated:

> [T]he indorsement of names of witnesses upon an information is largely a matter of discretion with the court; and, in the absence of a showing of abuse, or that some substantial injury has resulted to the accused, an order permitting such indorsement, even after the trial has commenced, does not constitute of itself reversible error.

*Id.* at 613, 200 P.2d at 671 (quoting 16 Corpus Juris § 2027 at 796).

We conclude that the district court did not abuse its discretion in admitting this testimony. There was no bad faith on the prosecution's part and the late endorsement of the witness did not prejudice Domingues significantly in that the district court granted defense counsel the opportunity to interview the witness prior to her testimony.

Twelfth, Domingues asserts that three of the prosecutor's statements at the penalty hearing closing argument amounted to prosecutorial misconduct, thus requiring a new penalty hearing.

The prosecutor expressed the following to the jury at the penalty hearing with regard to the torture, depravity of mind, or mutilation aggravating circumstance:

> In an aggravated circumstance, it is based upon the depravity of mind. It must include torture, mutilation or some other serious or depraved physical abuse beyond the act of killing itself.
>
> Well, let's take Arjin. She took a blow to the head. She took a blow to the head by the defendant, that didn't kill. You heard the coroner testify. *Certainly, if you were to kill me, I would prefer a gunshot to the chest.*

(Emphasis added.) At this point, defense counsel objected on the ground that this statement improperly indicated how the prosecutor would prefer to die. The district court sustained the objection. We conclude that this statement is not so prejudicial as to constitute prosecutorial misconduct.

In concluding his closing argument to the jury, the prosecutor made the following remarks:

> What kind of bizarre individual is this? This man should scare us. Nothing cries for justice like the voice of a murdered child. *This is the time for accountability and responsibility.* Death is the only appropriate sentence in this case. Anything less is disrespectful to the dead and irresponsible to the living.

(Emphasis added.) On appeal, Domingues claims that this remark is an improper comment on community standards and a call for revenge.

In Collier v. State, 101 Nev. 473, 479, 705 P.2d 1126, 1129-30 (1985), this court disapproved of a prosecutor's statement to the jury that it must be angry with the defendant or else "we are not a moral community." This court concluded that this comment, among others, was a blatant attempt to inflame the jury and inappropriately encouraged them to approach their duties with anger. *Id.* In the instant case, the prosecutor's statement does not rise to the level of impropriety as the statement in *Collier*. Here, the prosecutor sought to remind the jury that criminal defendants should be held accountable and responsible for their reprehensible acts; the victims were individuals whose lives had meaning and worth; their deaths represented a unique loss to society.

Accordingly, we conclude that the prosecutor's statement in the instant case does not amount to prosecutorial misconduct.

At the penalty hearing, Arjin Pechpo's mother, Tawin Thompson, testified regarding her relationship with her grandson, Jonathan Smith:

> Two people is so special for me. Eight o'clock at night, he look at the clock, no matter where he is at, make phone call, eight o'clock. He know my time to go to bed. He call and say, "Good night, Grandma, I love you." How he affect my life, now eight o'clock at night, I still looking for my grandson to call me. I didn't expect he leave me at all. I still don't believe it, believe me.

Referring to Thompson's comments, the prosecutor later remarked in his closing argument to the jury:

> No crime is so heinous as one which involves a little child. Words were once said and it seems appropriate now: A simple child that lightly draws its breath and feels its life in every limb, what should it know of death? Such a child was Jonathan Smith, cheerful, trusting, affectionate, innocent, pure, respectful of his family; *never again to pick up the telephone at eight o'clock in the evening and to call Grandma.*

(Emphasis added.) These comments were based upon Thompson's testimony and were therefore admissible. *See* Collins v. State, 87 Nev. 436, 439, 488 P.2d 544, 545 (1971) (holding that the prosecutor's statements in closing argument, when made as a deduction or conclusion from the evidence introduced in the trial, are permissible). Further, Thompson's remarks, and the prosecutor's reiteration of them, were properly admitted as victim impact testimony. Payne v. Tennessee, 501 U.S. 808 (1991 ); Homick v. State, 108 Nev. 127, 825 P.2d 600 (1992). We conclude that all three statements by the prosecutor taken together did not constitute prosecutorial misconduct. Therefore, Domingues's argument lacks merit.

Finally, Domingues argues that the district court erred in denying his motion to strike the aggravating circumstances relating to prevention of lawful arrest and "torture, depravity of mind, or mutilation." We hold that there was sufficient evidence to warrant the submission of the prevention of lawful arrest aggravating circumstance to the jury for its consideration and sufficient evidence to support the jury's finding of it for the murder of Jonathan Smith. However, with regard to the torture, depravity of mind, or mutilation aggravator, we hold that it was not appropriate for submission to the jury, as the facts surround-

ing both murders did not warrant this instruction, and there was not sufficient evidence to support the jury's finding of that aggravating circumstance for either murder.

In its Notice of Intent to Seek Death Penalty, the State disclosed its intention to present evidence of the following six aggravating circumstances at the penalty hearing:

> 1. The murder was committed by a person who knowingly created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person. NRS 200.033(3).
>
> 2. The murder was committed while the person was engaged in the commission of or an attempt to commit any Burglary and/or Home Invasion. NRS 200.033(4).
>
> 3. The murder was committed while the person was engaged in the commission of or an attempt to commit any Robbery. NRS 200.033(4).
>
> 4. The murder was committed to avoid or prevent a lawful arrest or to effect an escape from custody. NRS 200.033(5).
>
> 5. The murder involved torture, depravity of mind or the mutilation of the victim. NRS 200.033(8).
>
> 6. The defendant has, in the immediate proceeding, been convicted of more than one offense of murder in the first or second degree. NRS 200.033(10).

Domingues filed a pretrial motion to strike factors one (risk of death to more than one person), four (prevention of lawful arrest), and five (torture, depravity of mind, or mutilation). The district court determined that Domingues's motion was premature and agreed to hear it following the guilt phase of the proceedings.

At the rehearing of Domingues's motion to strike certain aggravating factors prior to the penalty hearing, the State acknowledged its agreement to strike the first aggravating circumstance—risk of death to more than one person. The district court then struck the first aggravating circumstance, but denied Domingues's motion to strike the aggravating factors of prevention of lawful arrest and torture, depravity of mind, or mutilation. Specifically, the district court ruled that sufficient issues of fact existed to warrant submission of each factor to the jury for consideration.

After considering the evidence adduced at the penalty hearing, the jury imposed one sentence of death for the murder of Arjin Pechpo and another sentence of death for the murder of Jonathan Smith. In so doing, the jury found that every one of the aggravating circumstances was established beyond a reasonable doubt for the murder of Jonathan Smith and all but prevention of lawful

arrest circumstance were found to exist beyond a reasonable doubt for the murder of Arjin Pechpo. In both instances, the jury determined that there were no mitigating circumstances sufficient to outweigh the aggravating circumstances.

On appeal, Domingues argues that the evidence did not warrant the district court's instructions to the jury regarding the aggravating circumstances of prevention of lawful arrest for the murder of Jonathan Smith, and the aggravating circumstance of torture, depravity of mind, or mutilation for either murder. In the alternative, Domingues contends that there was insufficient evidence to support the jury's findings of these aggravating circumstances.

We hold that the evidence supports the aggravating circumstance of prevention of lawful arrest for Jonathan Smith's murder.[4] Michelle Fleck testified that Domingues told her that he waited for the victims, that upon Pechpo's entry he placed a gun to her head, ordered her to the floor, "tied her hands up and then went on choking her." After he had killed Pechpo and dragged her body to the bathtub, Domingues turned his attention to Jonathan Smith who had followed him into the room. At that point, Domingues ordered Jonathan into the bathtub and killed him.

Based upon this sequence of events, there was sufficient evidence to support the submission of this aggravating circumstance to the jury, and the jury's finding that Domingues killed Jonathan to prevent him from identifying Domingues as the perpetrator of his mother's murder and robbery. Cavanaugh v. State, 102 Nev. 478, 486, 729 P.2d 481, 486 (1986) (holding that it is unnecessary that arrest be imminent, and where the defendant clearly murdered the victim to avoid arrest, no more is required under the statute for the aggravating circumstance of prevention of lawful arrest). Thus, Domingues's contention concerning the prevention of lawful arrest aggravating circumstance lacks merit.

---

[4]Domingues cites to Jiminez v. State, 105 Nev. 337, 775 P.2d 694 (1989), to support his position. In *Jiminez,* this court reversed the defendant's penalty after concluding that there was insufficient evidence for the finding that the defendant murdered his victim to prevent or avoid lawful arrest. *Id.* at 343, 775 P.2d at 698. The facts in *Jiminez* are clearly distinguishable from those in the instant case. In *Jiminez,* the police found the two victims in a bar the day after it had been robbed. *Id.* No evidence was adduced to indicate that they were killed while the defendant attempted to flee or that the defendant killed to avoid arrest. *Id.*

Here, there is no reason other than the prevention of lawful arrest to explain the murder. Domingues must have been concerned that Jonathan would be able to identify him. Therefore, prevention of lawful arrest was properly submitted to the jury as an aggravating circumstance.

Domingues also argues that there was insufficient evidence to support the torture, depravity of mind, or mutilation aggravating circumstance set forth in NRS 200.033(8) as to either murder.[5] We agree. In Robins v. State, 106 Nev. 611, 798 P.2d 558 (1990), this court stated:

> Although Instruction No. 8 specifies torture and depravity of mind in both the disjunctive and conjunctive, we construe the instruction and the statute [NRS 200.033(8)] upon which it is based as requiring torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself as a qualifying requirement to an aggravating circumstance based in part upon depravity of mind.

*Id.* at 629, 798 P.2d at 570. Thus, the aggravating circumstance enunciated in NRS 200.033(8) requires that the murderer must have intended to inflict pain beyond the killing itself.

Torture is the basis for the jury's finding of this aggravator, yet the circumstances of Jonathan Smith's murder do not support a finding of torture. The evidence indicates that Domingues ordered Jonathan Smith to lie down in the bathtub and then threw an electric hairdryer into the bathtub in an attempt to electrocute the child. When this attempt proved ineffective, Domingues stabbed the child to death. The evidence does not indicate that Domingues's intent was anything other than to kill the child by electrocution and when that method of execution failed, he stabbed the child to death. There is no evidence that the specific intent behind the attempted electrocution or the stabbing was to inflict pain for pain's sake or for punishment or sadistic pleasure.[6]

Similarly, there is insufficient evidence to support the aggravating circumstance of torture, depravity of mind, or mutilation as to Arjin Pechpo's murder. Although there is evidence that Pechpo suffered a blunt force trauma to her head, there is no evidence that she suffered any act of torture or mutilation in addition to the

---

[5]NRS 200.033(8) provides that "[t]he only circumstances by which murder of the first degree may be aggravated are: . . . (8) [t]he murder involved torture, depravity of mind or the mutilation of the victim."

[6]We accede that most killings involve the infliction of pain. However, most murders do not qualify as torture murders. Torture involves a calculated intent to inflict pain for revenge, extortion, persuasion or for any sadistic purpose. *Black's Law Dictionary* 1490 (6th ed. 1990). For this reason, we urge Nevada's district attorneys to be more discriminating in charging the torture aggravating circumstance in the future.

ligature strangulation. Thus, there is no evidence to support this aggravating circumstance and it cannot stand.

However, we have carefully reviewed the evidence in this case and conclude that it supports the jury's finding of each of the remaining three aggravating circumstances. The jury determined that there were no mitigating circumstances sufficient to outweigh the aggravating circumstances. After careful review, we conclude beyond a reasonable doubt that the jury would have reached the same result had the invalid aggravator been omitted. Lane v. State, 110 Nev. 1156, 1169, 881 P.2d 1358, 1367 (1994); Canape v. State, 109 Nev. 864, 882, 859 P.2d 1023, 1035 (1993).

In cases in which the death penalty is imposed, this court is also statutorily required to consider whether the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor and whether the sentence of death is excessive considering both the crime and the defendant. NRS 177.055(2). We conclude that the death sentence was not imposed under the influence of passion, prejudice or any arbitrary factor, nor was it excessive in this case. The jury sentenced Domingues to death based upon the aggravating circumstances of the murders as revealed during the trial. The jury found beyond a reasonable doubt that Domingues killed Arjin Pechpo by strangling her with a ligature in order to steal certain items of her personal property, and killed Pechpo's four-year old son, Jonathan Smith, by stabbing him. Considering the circumstances and the senseless nature of these murders, the jury's decision that Domingues should be put to death for the murders was not excessive.

Having determined that Domingues was fairly tried, convicted and sentenced, we affirm the district court's judgment of conviction and the sentence of death.

STEFFEN, C. J., and YOUNG, SPRINGER and ROSE, JJ., concur.