PEDRO RODRIGUEZ, Appellant, v. THE STATE
OF NEVADA, Respondent.

No. 35300

October 17, 2001                    32 P.3d 773

*Robert Bruce Lindsay,* Reno, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Richard
A. Gammick,* District Attorney, and *Terrence P. McCarthy,*
Deputy District Attorney, Washoe County, for Respondent.

# OPINION

*Per Curiam:*

Appellant Pedro Rodriguez and co-defendants Robert Paul Servin and Brian Lee Allen murdered and robbed Kimberly Fondy on April 5, 1998. Rodriguez and Servin were tried together, convicted, and sentenced to death. Allen pleaded guilty to the murder and robbery charges, and a three-judge panel sentenced him to serve two consecutive prison terms of life without the possibility of parole.

Rodriguez contends that a number of errors occurred in the district court. We conclude that none of Rodriguez's assignments of error warrant relief, and affirm the judgment of conviction and sentence of death.

## FACTS

### I. *Guilt phase*

The following evidence was adduced at trial: on April 5, 1998, Rodriguez, Servin, and Allen set out to rob Kimberly Fondy of $35,000 reportedly kept in a safe in her house. Due to an accident which occurred when she was sixteen years old, Fondy was paralyzed below the mid-back and ambulated with the use of a wheelchair.

Nineteen years old at the time of the crime, Rodriguez was the oldest of the three—Allen was seventeen years old, and Servin was sixteen years old. According to Allen and several witnesses, Rodriguez provided the information regarding the location of Fondy's house and the supposed existence of the money; he was the only one of the three who knew Fondy and had, at one time, lived with her at her Sparks residence. While living with Fondy, Rodriguez came into possession of a key to a safe that he believed contained a large amount of money. After ingesting the methamphetamine "crank" for a number of hours, and with Rodriguez behind the wheel, the three young men drove to Fondy's home armed with a shotgun provided by Servin and a .22 caliber revolver owned by Allen.

Allen testified to the following facts: during the drive to Fondy's home, Servin stated that he "was going to shoot her if he had to." Upon arrival, Rodriguez shut off the engine and waited in the car while Servin and Allen approached the front door, which Servin proceeded to kick open. The two men entered the home—Servin armed with the revolver and Allen with the

shotgun—and eventually found Fondy in her wheelchair in the master bedroom with a portable telephone in her hand.

Fondy was in the process of reporting the two intruders via a 9-1-1 emergency call when she was apparently confronted by Servin. Although her call was terminated before it was answered, the electronic taping system automatically started recording immediately after the initial dialing. Therefore, upon review of the tape of the 9-1-1 call and hang-up, the dispatcher was able to recognize a female voice whispering what sounded like, "There are two of them."

According to Allen, upon seeing Fondy with the phone in her hand, Servin pointed the revolver at her head, yelled at her to "shut up," grabbed the phone out of her hand, tossed it on the bed, and ordered her to get into the bathroom; Fondy repeatedly stated, "I'll give you the money." Servin also hit Fondy in the head so she would stop screaming. Meanwhile Rodriguez, wearing a black and white bandana covering his face except for his eyes, entered the home and found Fondy, Servin, and Allen in the master bedroom. Servin tried to block Fondy's view of Rodriguez so she would not be able to see and identify him—the only one of the three she knew.

Allen testified that Rodriguez immediately located Fondy's safe on a vanity shelf in the bedroom, even though it was hidden and disguised as furniture. Rodriguez tossed the safe into the hallway and ordered Allen to take it outside. According to Allen, he then returned to the car with the safe, leaving Rodriguez and Servin alone in the house with Fondy. Approximately two to three minutes later, Rodriguez returned to the car. Allen testified that soon after that he heard four gunshots—two shots followed by two more shots after a brief delay. A neighbor of Fondy's testified that she heard "a loud pop," and a few minutes later, the same loud sound again.[1] Within minutes after the shooting, Servin returned to the car, and with Rodriguez again behind the wheel, the three young men drove away.

After stopping by the home of Servin and Allen to pick up some friends, all three resumed ingesting crank and proceeded on to the residence of friends, Carlos and Joana Diaz. After some initial difficulty, Rodriguez managed to open the locked safe, and inside were miscellaneous papers, documents, and a baseball, but not the expected money. According to Joana Diaz, Rodriguez became angry and stated, "This bitch lied. There is no money in here."

At the Diaz home that night and the following morning, numer-

---

[1] Emma Hernandez, Servin's girlfriend and the mother of his child, testified that Rodriguez told her later that evening that he was outside Fondy's house when the shooting took place.

ous inculpatory statements were made by the three men. Both Carlos and Joana Diaz testified that Rodriguez, Servin, and Allen were present when one of the three said that the bullets used in the shooting were dipped in either acid or mercury. Servin told Carlos Diaz that this was done in order to "kill her a little slow or something," and Allen told Joana Diaz that it was done "[s]o a person could die and make them suffer." Neither Rodriguez, Servin, nor Allen contradicted or corrected any of the statements made concerning the bullets or the commission of the crime.

Rodriguez and Servin were bragging about the crime during the night, and according to Allen, Servin admitted to shooting Fondy. Rodriguez told Emma Hernandez that they had shot her three or four times, and that "[w]e did it, fool." According to several witnesses, Rodriguez was seen in possession of Fondy's electronic organizer, and Servin was in possession of Fondy's cellular phone, Gameboy device, and $80 taken from her purse. Both Rodriguez and Servin at different times were in possession of a knife that Joana Diaz believed came from the Fondy residence. Rodriguez told Servin and Allen "not to say anything, because if they did, something was going to happen to them." Joana Diaz also testified that both Rodriguez and Servin threatened to kill anyone present at the Diaz home who spoke about the crime; Servin, referring to Allen, Rodriguez, Hernandez, and Carlos and Joana Diaz, reportedly stated that if anybody said anything that he would "smoke 'em." Rodriguez called Fondy's home at some point during the night to see if any police were there.

According to Joana Diaz, the following morning Rodriguez stated that he had difficulty sleeping because "he saw [Fondy's] eyes everywhere." Servin's brother, Fernando Machado, testified that after arriving at the Diaz home and hearing about the robbery and shooting, he asked Rodriguez, Servin, and Allen, "[w]hy didn't they just tie her up and then rob her. Why did they have to shoot her," to which there was no response. Machado also heard Rodriguez state that "if the first bullet didn't do it, the other one did," because it was mercury-tipped.

An autopsy performed the morning after the murder revealed that Fondy was shot once in the right shoulder, once in the right leg, and twice in the head; the two shots to the head were contact wounds indicating that the muzzle of the gun was in direct contact with the skin when the gun was fired. Additionally, the autopsy revealed that Fondy suffered various abrasions on her neck and chest and an incised wound on the top of her head, which indicated that a sharp, slicing cut was made across the skin. Dr. Roger S. Ritzlin testified that Fondy was alive when the wounds were inflicted; thus, in his opinion the evidence was consistent with the theory that the first two shots were non-lethal

shots to Fondy's shoulder and leg and the second two shots were the lethal shots to her head. Other testimony established that Fondy did not appear to have any noticeable injuries to her neck, chest, or head earlier on the day she was murdered.

Rodriguez and Servin chose not to testify at their trial, and on October 18, 1999, the jury found them guilty of first degree murder and robbery, both with the use of a deadly weapon.

## II. *Penalty phase*

The penalty hearing began the following day, and both Rodriguez and Servin objected to the verdict forms, proposing instead the use of special verdict forms requiring that any mitigating circumstances found by the jury be specified in the same manner as the aggravating circumstances. The district court overruled the objections.

The State presented evidence of two separate incidents involving Rodriguez at the Skyline Mobile Home Park in Reno. The first occurred during the evening of June 17, 1997: gun shots were heard and the manager of the park, Penny Henry, called the Reno police. Assistant manager, Jean Mazzo, identified unit number 77 as the location of the shots, and the police eventually arrived and brought Rodriguez out of the house. After Henry confirmed for the police that she knew Rodriguez and that he lived there, Rodriguez screamed at Henry, "Penny, I will fuck you and kill you. I will fucking rape your daughter. And I'll come back and kill everyone in the park." Henry testified that Rodriguez repeated the threats numerous times and that "[h]e was totally out of control." Mazzo testified that Rodriguez repeatedly spat at the police officers and called them "fucking pigs." Reno police officer Scott Armitage testified that Rodriguez also threatened the officers on the scene, screaming repeatedly, "Fuck you, pigs. I'll rape your kids. I'll rape your wives. My family is Mafia. We worship the devil. 666." Rodriguez was charged with harassment and disturbing the peace and eventually pleaded guilty.

The second incident occurred in September of 1997. A fourteen-year-old girl was visiting a friend at the same mobile home park, and when she went to the back bedroom to use the bathroom, Rodriguez appeared and anally and vaginally raped her at knife-point. The victim testified that Rodriguez held the knife at the back of her neck and threatened to stab her if she screamed. Rodriguez eventually was convicted, pursuant to a guilty plea, of felony sexual assault with the use of a deadly weapon and was sentenced to two consecutive prison terms of life with the possibility of parole.

In mitigation, Rodriguez presented testimony regarding the circumstances of his childhood from his uncle, Jesus Rodriguez.

Jesus stated that Rodriguez's parents separated when he was approximately one year old and that his mother never worked, survived on welfare, was often in jail, and beat him regularly. Further, Rodriguez's mother had relationships with many different men, one of whom was a drug addict that initiated Rodriguez's own drug use. Jesus testified that she once brought Rodriguez to him stating, "I don't want him anymore. Keep him." Jesus told of another incident when she left Rodriguez and her other children in a car while she stayed in her house doing drugs. One of Rodriguez's younger brothers died at a young age, and one of his stepfathers died from a drug overdose. According to Jesus, Rodriguez's mother was in jail at the time of the trial.

On cross-examination by the State, Jesus admitted that he did not know about any of the legal problems Rodriguez faced throughout the 1990s, and in fact, was surprised to hear about them. Rodriguez chose not to exercise his right to allocution.

On October 20, 1999, the jury returned a verdict sentencing both Rodriguez and Servin to death after finding that there were no mitigating circumstances sufficient to outweigh the aggravating circumstances. With regard to Rodriguez, the jury found six aggravating circumstances: (1) the murder was committed in the commission of the crime of robbery; (2) the murder was committed in the commission of the crime of burglary; (3) the murder was committed in the commission of the crime of home invasion; (4) the murder was committed to avoid or prevent a lawful arrest; (5) the murder involved torture and/or mutilation of the victim; and (6) Rodriguez had previously been convicted of a felony crime of violence.

On December 3, 1999, prior to sentencing, Rodriguez made the following statements to the district court:

> Yeah, all I gotta say is I don't feel sorry what happened. I don't have no remorse towards it, and I understand what I'm about to do right now is I'm about to waive all my appeals, and that's about it. Can't kill me. I'm already dead.
>
> . . . .
>
> Another thing is my attorneys did advise me and they did want me to go along with my appeals, but my final decision is I don't want no appeals. I'm waiving all my rights towards appeals, so that's about it.[2]

The district court then sentenced Rodriguez to death by lethal injection for first degree murder with the use of a deadly weapon

---

[2] Neither the briefs nor the record provide any further information with respect to Rodriguez waiving his right to appeal. In light of the fact that his counsel has filed briefs raising substantive issues, we must assume that Rodriguez changed his mind about the waiver.

(count I), and to two consecutive prison terms of 72 to 180 months for robbery with the use of a deadly weapon to run consecutively to count I. Rodriguez was also ordered to pay restitution in the amount of $3,272.67, jointly and severally with Servin.

A unanimous three-judge panel sentenced Allen to two consecutive prison terms of life without the possibility of parole for the murder charge (count I), and to two consecutive prison terms of 72 to 180 months for the robbery charge to run consecutively to count I.

## DISCUSSION

### I. The denial of appellant's pretrial motion for severance

Rodriguez claims that the district court erred by denying his motion to sever the trial. He argues that various statements made by Servin and introduced at trial through Allen and other witnesses constituted a violation of *Bruton v. United States*,[3] and that a separate trial was warranted because his defense was antagonistic to Servin's defense. We disagree and conclude that Rodriguez's contentions are without merit and that the district court did not err in denying the severance motion.[4]

NRS 174.165(1) permits the district court to sever a joint trial "[i]f it appears that a defendant . . . is prejudiced by a joinder of . . . defendants . . . for trial together." This court has stated "that where persons have been jointly indicted they should be tried jointly, absent compelling reasons to the contrary,"[5] and that "[a] court must consider not only the possible prejudice to the defendant but also the possible prejudice to the state resulting from expensive, duplicitous trials."[6] Further, severance should only be granted when there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or inno-

---

[3]391 U.S. 123 (1968).

[4]Citing *United States v. Allen*, 160 F.3d 1096, 1106 (6th Cir. 1998), and *United States v. Sherwood*, 98 F.3d 402, 409 (9th Cir. 1996), the State invites this court to hold that in order to preserve a claim related to the denial of a motion for severance, the motion must be renewed at the close of the State's case-in-chief. We decline the State's invitation and are not aware of any Nevada authority in support of it.

[5]*Jones v. State*, 111 Nev. 848, 853, 899 P.2d 544, 547 (1995).

[6]*Byford v. State*, 116 Nev. 215, 229, 994 P.2d 700, 710, *cert. denied*, 531 U.S. 1016 (2000); *see also* NRS 173.135.

cence."[7] It is the appellant's "heavy burden" to show that the district court abused its discretion in failing to sever the trial.[8]

### Bruton violation

First, Rodriguez contends that admission into evidence of Servin's statement made in the car on the way to Fondy's residence, that he "was going to shoot her if he had to," constitutes a Bruton violation. He argues that the statement was used against him to prove that he heard it and did not object.

The United States Constitution's Sixth Amendment right of confrontation prevents the use at a joint trial of a non-testifying defendant's admission if it incriminates another defendant.[9] In this case, however, Rodriguez's reliance on Bruton is misplaced because the statement did not facially or expressly implicate anyone in the murder other than Servin. Further, as the State argues, the statement would have been admissible in a separate trial against Rodriguez as a statement by a coconspirator.[10]

Second, Rodriguez contends that admission into evidence of Servin's statement made at the Diaz home, that "we robbed someone," constitutes a Bruton violation. This statement was directed to the Diazes and Emma Hernandez and occurred while Rodriguez and Allen were attempting to pry open the safe. Assuming this statement falls under Bruton's protective rule, we conclude that its admission into evidence was harmless error. There was strong admissible evidence of Rodriguez's guilt. Rodriguez's own statements regarding his participation in the crime were properly admitted,[11] and a defendant's own statements may be considered in assessing whether a Bruton error, if any, was harmless.[12] Therefore, we conclude that Rodriguez's Bruton claims fail to establish reversible error.

---

[7]Zafiro v. United States, 506 U.S 534, 539 (1993).

[8]Amen v. State, 106 Nev. 749, 756, 801 P.2d 1354, 1359 (1990); see also United States v. Lane, 474 U.S. 438, 449 (1986) (reversal is required only if joinder had a substantial and injurious effect or influence in determining the jury's verdict).

[9]See Bruton, 391 U.S. 123; Ducksworth v. State, 114 Nev. 951, 966 P.2d 165 (1998); see also U.S. Const. amend. VI.

[10]See NRS 51.035(3)(e) (statement is non-hearsay and admissible if "statement is offered against a party and is . . . [made] by a coconspirator of a party during the course and in furtherance of the conspiracy").

[11]See NRS 51.035(3)(a).

[12]See Cruz v. New York, 481 U.S. 186, 193-94 (1987); see also United

### Antagonistic defenses

Rodriguez also contends that the existence of antagonistic defenses required the granting of his motion for severance. Inconsistent or antagonistic defenses, however, do not necessarily entitle defendants to severance,[13] and "[i]nconsistent defenses must be antagonistic to the point that they are mutually exclusive."[14] Rodriguez wholly fails to articulate what competing defense theories were present at trial, and a review of the record reveals that both Rodriguez and Servin merely claimed that someone else did the shooting. We conclude that the district court did not err in refusing to sever the trials based on antagonistic defenses.

## II. *The testimony of co-defendant Allen*

Rodriguez contends that the presentation of Allen's testimony constituted prosecutorial misconduct and that the district court should have excluded the testimony. Allen pleaded guilty and testified that he did not receive a sentencing deal from the State, indicating to the jury that he, too, might face the imposition of the death penalty by a three-judge panel. In his opening brief, Rodriguez argues that Allen lied about the existence of a deal. He claims that the State did not ask the three-judge panel for a death sentence in Allen's case, demonstrating that a de facto deal was in place, which should have been disclosed to the jury. Based on this argument, Rodriguez further insists that the district court erred in not instructing the jury regarding witness bias.

The record, however, does not support this contention—the prosecutor *did* seek the death penalty against Allen. In closing arguments at Allen's sentencing hearing, the prosecutor made the following comments:

> So when the Court considers not merely his death eligibility, but his death worthiness, I would submit to the Court there

---

*States v. Vejar-Urias,* 165 F.3d 337, 340 (5th Cir. 1999) (*Bruton* error may be harmless where, disregarding the co-defendant's statement, there is otherwise ample evidence against a defendant); *Lisle v. State,* 113 Nev. 679, 693, 941 P.2d 459, 468 (1997) (recognizing that any error in admitting co-defendant's statement that he saw the "other guy" shoot the victim would be harmless because four other witnesses testified to hearing defendant confess), *limited on other grounds by Middleton v. State,* 114 Nev. 1089, 1117 n.9, 968 P.2d 296, 315 n.9 (1998).

[13]*See Jones,* 111 Nev. at 854, 899 P.2d at 547 (citing *Zafiro,* 506 U.S. 534).

[14]*Amen,* 106 Nev. at 756, 801 P.2d at 1359.

is little evidence of any remorse. There is a whole host of evidence of future dangerousness.

. . . .

*I'd ask the Court to impose a sentence of death* on Mr. Allen for his participation in this crime of the torture, robbery and murder of Kimberly Fondy.

(Emphasis added.) Because Rodriguez's contention is not supported by the record, we conclude that it lacks merit.

## III.  *Reasonable doubt jury instruction*

Rodriguez states that the district court erred by rejecting a jury instruction offered at trial regarding reasonable doubt. We conclude that the district court did not err in giving the mandatory statutory instruction on reasonable doubt.[15] This court has upheld the constitutionality of the instruction where, as here, the jury received additional instruction on the State's burden of proof and the presumption of innocence.[16]

## IV.  *Denial of pretrial motions*

Rodriguez lists sixteen pretrial motions denied by the district court that cumulatively add up to alleged error. His argument in toto consists of citing to *Anders v. California*[17] and *Sanchez v. State*[18] for the proposition that "this Court is under an affirmative duty in an automatic appeal in a death penalty case to scrutinize the entire record for error which would entitle appellant to relief from his conviction and sentence."[19]

The fact that an appeal is automatic in this capital case under NRS 177.055(1) does not obviate Rodriguez's responsibility to provide this court with cogent argument supported by legal authority and reference to relevant parts of the record.[20] Aside

---

[15]*See* NRS 175.211.

[16]*See Middleton,* 114 Nev. at 1111-12, 968 P.2d at 311; *Bollinger v. State,* 111 Nev. 1110, 1115, 901 P.2d 671, 674 (1995).

[17]386 U.S. 738 (1967).

[18]85 Nev. 95, 450 P.2d 793 (1969).

[19]Both Rodriguez and the State failed to note in their respective briefs that this court has expressly overruled the mandate of *Sanchez. See Ramos v. State,* 113 Nev. 1081, 1084, 944 P.2d 856, 858 (1997) ("We elect to . . . opt out of the *Anders* quagmire. With respect to cases filed after this opinion, *Sanchez* is overruled.").

[20]*See Mazzan v. Warden,* 116 Nev. 48, 75, 993 P.2d 25, 42 (2000); NRAP 28(a) and (e); NRAP 28A(a)(3).

from "[a]ny errors enumerated by way of appeal," this court's mandatory review of capital appeals is limited to three questions regarding the correctness of the death sentence.[21] We conclude that Rodriguez has failed to demonstrate any prejudicial error arising out of the district court's rulings on the motions.

## V. *Aggravating circumstances*

Rodriguez contends that the Fifth and Eighth Amendments to the United States Constitution are violated by the imposition of the death penalty in a case of felony murder.[22] He also argues that there is no support in the record for the aggravator found by the jury that the murder was committed to avoid or prevent a lawful arrest, that the aggravators of robbery and burglary are duplicative, and that there was insufficient evidence of torture. We conclude that Rodriguez's contentions are without merit.

First, the State concedes that a felony-murder conviction alone does not warrant the imposition of the death penalty; however, as the jury was instructed, NRS 200.033(4)(b) allows for a sentence of death when the non-killing co-defendant participates in an enumerated felony and "[k]new or had reason to know that life would be taken or lethal force used." Further, the United States Supreme Court has stated:

> [W]e hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.[23]

Therefore, provided that the proper scienter is shown, the United States Constitution does not preclude the imposition of death in a case of felony murder. We conclude that, at the very least, Rodriguez had reason to know that lethal force would be used and exhibited a reckless disregard for human life. The record shows that he led two cohorts armed with guns to Fondy's house to break in and rob her, and afterwards he did not express any surprise or regret at the killing, but rather bragged about it.

Second, evidence showed that Servin tried to shield Rodriguez from Fondy because she knew Rodriguez and would have been able to identify him as one of her assailants. Rodriguez was the

---

[21]*See* NRS 177.055(2).

[22]*See* U.S. Const. amends. V, VIII.

[23]*Tison v. Arizona,* 481 U.S. 137, 157-58 (1987).

only one of the three who attempted to conceal his identity by wearing a bandana covering his face; nevertheless, it was reasonable for the jury to infer that Rodriguez made eye contact with Fondy based on his statements the following morning regarding being unable to sleep due to seeing "her eyes everywhere." Thus, it was also reasonable for the jury to have inferred from the testimony that the killing of Fondy was to prevent her from identifying Rodriguez as one of the robbers. We conclude that there was sufficient evidence to support the aggravator that the murder was committed to avoid or prevent a lawful arrest.[24]

Third, Rodriguez contends that a defendant cannot be convicted of both burglary and robbery, and therefore, relying on *Lane v. State*,[25] he argues that it was improper to present both to the jury for consideration as aggravators. This contention has no merit. A defendant can be convicted of both offenses, and this court has repeatedly held that each may be used as an aggravating circumstance.[26]

Finally, Rodriguez contends there was insufficient evidence to support the aggravator of torture. Rodriguez argues that it is undisputed that he was unarmed during the commission of the crime, and that it was prosecutorial misconduct for the State to argue at the penalty phase that he used a knife to torture Fondy.

The State counters by arguing that in the penalty phase, a prosecutor may urge the jury to make reasonable inferences from the evidence, and therefore there was no misconduct.[27] The State points out that Fondy suffered an incised wound on the top of her head indicating the use of a knife. The State argues that the wound was most likely caused by Rodriguez because both Allen and Servin already were armed and the penalty phase evidence supports the proposition that a knife was Rodriguez's weapon of choice against women. Further, trial testimony revealed that Rodriguez was seen in possession of a knife at the Diaz home later that night. We conclude that the State did not commit pros-

---

[24]*Cf. Domingues v. State,* 112 Nev. 683, 701, 917 P.2d 1364, 1376-77 (1996).

[25]114 Nev. 299, 303-04, 956 P.2d 88, 91-92 (1998) (holding it improper to find the aggravators of robbery and of receiving money when both are based on the same facts).

[26]*See, e.g., Bennett v. State,* 106 Nev. 135, 142, 787 P.2d 797, 801-02 (1990).

[27]*See Domingues,* 112 Nev. at 696, 917 P.2d at 1373.

ecutorial misconduct by presenting this theory to the jury at the penalty phase.

Regardless of whether Rodriguez was armed with a knife, the evidence is still sufficient to support the finding of torture as an aggravator under NRS 200.033(8). NRS 200.033(8) does not expressly require that each defendant individually torture the victim.[28] A finding of torture "requires that the murderer must have intended to inflict pain beyond the killing itself."[29] Further, "[t]orture involves a calculated intent to inflict pain for revenge, extortion, persuasion or for any sadistic purpose."[30] Trial testimony made it clear that Fondy appeared uninjured the morning of the murder; the abrasions and incised head wound noted during the autopsy would have been visible if they had occurred earlier. There was no testimony or other evidence that the wounds were incidental to a struggle or that Fondy, from her wheelchair, raised a defense or posed a physical threat to her attackers. Therefore, there was little reason, other than to persuade her to open the safe or to indulge sadistic urges, for the beating she suffered or for the two non-lethal gun shots, one of which struck one of her paralyzed legs. Additionally, Rodriguez was bragging about the murder later that evening, and he was aware of and present when the discussion centered on how the bullets were dipped in either acid or mercury in order to make Fondy's death slow and painful.[31] These facts highlight Rodriguez's sadistic mental state.

VI. *Mandatory review*

NRS 177.055(2) requires this court to review every death sentence and consider in addition to any issues raised on appeal:

> (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
> (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
> (d) Whether the sentence of death is excessive, considering both the crime and the defendant.

The jurors found six aggravating circumstances, five of which, we conclude, are well founded: (1) the murder was committed in

---

[28]*See Byford*, 116 Nev. at 240, 994 P.2d at 717.

[29]*Domingues*, 112 Nev. at 702, 917 P.2d at 1377.

[30]*Id.* at 702 n.6, 917 P.2d at 1377 n.6.

[31]No evidence was presented by the State indicating that the bullets were actually dipped in any substance.

the commission of the crime of robbery; (2) the murder was committed in the commission of the crime of burglary; (3) the murder was committed to avoid or prevent a lawful arrest; (4) the murder involved torture and/or mutilation of the victim; and (5) Rodriguez was previously convicted of a felony crime of violence.

The jurors also found as an aggravator that the murder was committed in the commission of or flight after committing the crime of home invasion.[32] Home invasion involves the forcible entry of an inhabited dwelling without the occupant's permission.[33] For the reasons discussed in *Servin v. State*,[34] however, and considering the specific facts of this case, the aggravators of home invasion and burglary are duplicative and cannot be used as separate aggravating circumstances; accordingly, we conclude that the aggravating circumstance of home invasion is invalid. We further conclude after reweighing the remaining five aggravating circumstances against the mitigating evidence that invalidating the home invasion aggravator would not have impacted the jury's decision in sentencing Rodriguez to death, and that the remaining aggravators still outweigh the mitigators.

Finally, we conclude that there is no evidence that the jury imposed the sentence under the influence of passion, prejudice, or any arbitrary factor; and considering the violent nature of the crime, Rodriguez's role as the instigator and only adult participant, his utter lack of remorse, and his significantly violent prior criminal history, we conclude that the sentence of death is not excessive.

## CONCLUSION

We conclude that Rodriguez's assignments of error do not warrant relief. We therefore affirm his judgment of conviction and sentence of death.

---

[32]Both Rodriguez and the State mistakenly claim that the jury did not find the aggravator of home invasion. A review of the penalty phase transcript, the verdict form, and the warrant of execution entered below on December 3, 1999, clearly demonstrates that the aggravator was indeed found.

[33]*See* NRS 205.067(1).

[34]117 Nev. 775, 32 P.3d 1277 (2001).