*1112
 
 OPINION
 

 Per Curiam:
 

 FACTS
 

 David A. Bollinger (“Bollinger”) was convicted of two counts of murder in the first degree for killing Rose and James Vertrees (“the Vertreeses”), two counts of kidnapping, two counts of robbery, and one count of burglary. Bollinger, and possibly an accomplice identified as Tom Johnston (“Johnston”), robbed the Vertreeses in their motor home in Reno. After beating the Vertreeses to death, Bollinger, or he and Johnston, set fire to the Vertresses’ bodies at a rest-stop in Rifle, Colorado.
 
 [1]
 
 After being arrested in Colorado, Bollinger placed a tattoo on his shoulder which read “Pyro,” the nickname inmates had given him.
 

 After empaneling a jury, the district court admonished jurors, pursuant to NRS 175.401, to refrain from talking about the trial and to avoid coming into contact with the media. During trial, however, the district court often failed to admonish the jury before adjourning. At the conclusion of the trial, the district court issued the following instruction based upon the statutory definition of reasonable doubt:
 

 A reasonable doubt is one based on reason. It is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable, must be actual, not mere possibility or speculation.
 

 See
 
 NRS 175.211.
 

 During the sentencing phase of Bollinger’s trial, many witnesses testified that Rose Vertrees (“Rose”) was a very caring, generous person. While Rose was in good health, family members suspected that James Vertrees (“James”) was suffering from Alzheimer’s Disease. The State characterized James, who had
 
 *1113
 
 recently been imprisoned with Bollinger, as “definitely a different person. A tough man to live with.” Bollinger elicited testimony that Rose and James had recently been divorced, although they continued to live together in the motor home.
 

 The State also called as a witness Ernest Lee Meyers (“Meyers”), a ten-time felon who was incarcerated with Bollinger. Before allowing the jury to hear Meyers’ testimony, Meyers related to the district court that he tattooed Bollinger’s shoulder at Bollinger’s request. Meyers stated, “I don’t remember the whole — whole ordeal pertaining to that. I was back there putting on tattoos, and he asked for a tattoo. And I asked him what he wanted, and he said, T don’t know. Give me my nickname.’” Meyers then testified to similar effect before the jury.
 

 On cross-examination, Meyers also claimed that Bollinger told him that he was guilty. Meyers related that Bollinger told him that Bollinger hit James in the head with a pipe in Reno, but did not intend to kill him. Bollinger said that he and Johnston then drove the motor home, with Rose and James held hostage, from Reno to Colorado. According to Bollinger, when the two discovered that James was dead, Johnston killed Rose.
 

 The district court admitted a photo of the tattoo into evidence, having refused to do so during the guilt phase of the trial. The district court also admitted a certified copy of Bollinger’s prior conviction for grand larceny and order revoking probation.
 

 The district court issued separate sentencing forms for the murders of Rose and James. In preparing the forms and jury instructions, Bollinger stressed that jurors should understand that they could reasonably determine that Bollinger deserved a different sentence on each count. Each verdict form contained identical mitigating and aggravating factors which the district court instructed the jury to consider and select by checking corresponding boxes. The jury was instructed that it could “impose a sentence of death only if you find at least one aggravating circumstance and further find there are not mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.” The jury was also instructed that “[t]he law never compels the imposition of the death penalty” even if aggravating circumstances exist.
 

 With respect to Rose’s murder, the jury found Bollinger worthy of death. In support of this finding, the jury found no mitigating factors but selected all three possible aggravating factors: (1) Bollinger was under sentence of imprisonment at the time, (2) Bollinger committed the crime while engaged in or in flight from a robbery, burglary, or kidnapping, and (3) the murder was committed to avoid lawful arrest.
 

 
 *1114
 
 With respect to James’ murder, the jury found that Bollinger should be imprisoned for life without the possibility of parole. In support of this finding, the jury found the following two mitigating factors: (1) Bollinger had no significant criminal history, and (2) “other mitigating circumstance” existed. In addition, the jury did not select any of the three possible aggravating factors that it selected regarding Rose’s murder.
 

 Bollinger does not contend that the overwhelming amount of evidence admitted at trial was insufficient to convict him of murder. For this reason, we do not see the need to render an entire account of the proceedings below. Bollinger insists, however, that the district court erred in (1) failing to admonish the jury at every adjournment, (2) giving the statutory jury instruction concerning reasonable doubt, (3) allowing the jury to see Bollinger’s tattoo at sentencing, and (4) confusing or inflaming the jury to the extent that contradictory sentences were rendered. We affirm the judgment of the district court for the following reasons.
 

 DISCUSSION
 

 Admonishing the Jury
 

 Bollinger argues that more often than not the district court did not admonish the jury before adjourning. Noting that the language of NRS 175.401 is mandatory, Bollinger concludes that he is entitled to a new trial. The State responds that Bollinger never objected and has not shown that he was in any way prejudiced. The State points out that the district court properly admonished the jury after it was selected, and that jurors are presumed to follow this admonishment.
 

 We are unpersuaded by Bollinger’s argument, although we must emphasize in the strongest terms the importance of admonishing the jury pursuant to NRS 175.401 at every adjournment. Reversal is not always necessary when a district court fails to comply with the mandatory language of a statute.
 
 See
 
 People v. Jones, 62 Cal. Rptr. 304, 319 (Ct. App. 1967),
 
 cert. denied,
 
 390 U.S. 980 (1968). Bollinger makes no attempt to show prejudice, nor have we uncovered evidence of prejudice in the record.
 

 Nevada’s Reasonable Doubt Jury Instruction
 

 Bollinger argues that the district court erred in improperly instructing the jury concerning reasonable doubt. Bollinger argues that the “more weighty affairs” portion of the instruction is misleading because a decision concerning the more weighty affairs of our lives involves an element of risk-taking, while a
 
 *1115
 
 decision to convict is always retrospective, concerned only with resolving conflicting versions of factual propositions. Bollinger relies upon persuasive language found in Victor v. Nebraska,...... U.S......., 114 S. Ct. 1239 (1994), and State v. Ireland, 773 P.2d 1375 (Utah 1989), to support this argument.
 

 In Lord v. State, 107 Nev. 28, 38, 806 P.2d 548, 552 (1991), we upheld over constitutional challenge the “abiding conviction” element of Nevada’s reasonable doubt instruction. We did not scrutinize the “more weighty affairs” language presently under review. Nevertheless, we note that our “proper inquiry is not whether the instruction ‘could have’ been applied in unconstitutional manner, but whether there is a reasonable likelihood that the jury
 
 did
 
 so apply it.”
 
 Victor,
 
 ......U.S. at......, 114 S. Ct. at 1243 (emphasis in.original). We believe in Bollinger’s case that no such likelihood exists. We note that in
 
 Ireland
 
 the Supreme Court of Utah found use of the language Bollinger now questions to be harmless because two other jury instructions (concerning the State’s burden of proof and the presumption of innocence) were also offered.
 
 Ireland,
 
 773 P.2d at 1380.
 
 [2]
 
 Similar instructions were also offered in Bollinger’s case.
 

 
 *1116
 

 Bollinger’s Tattoo
 

 Bollinger argues that allowing the jury to view the tatoo was overly prejudicial in light of the fact that he received the death penalty for the murder of Rose, whose body was more severely burned than that of James. The State responds that the tatoo was directly relevant in illuminating Bollinger’s character. The State reasons that the tattoo is a testament to who Bollinger is and what he did, indicating a lack of remorse.
 

 We conclude that the State is correct. NRS 175.552(3) allows the district court to admit evidence “concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible.” The tattoo is relevant evidence concerning Bollinger’s character. The fact that Bollinger received this tattoo after he killed and burned Rose and James is highly illuminating. Although the State concedes that Bollinger did not devise his nickname, the record reveals that Bollinger chose the type of tattoo he received.
 

 Irreconcilable Verdicts
 

 Bollinger argues that the irreconcilable verdicts rendered in the sentencing phase of his trial can only be explained as the result of sympathy or passion for one victim to the exclusion of the other, the result of showing the “Pyro” tattoo to the jury, or confusion. Because the two murders were based on the same facts, Bollinger wonders how the jury could have found as an aggravating circumstance that he was under sentence of imprisonment when he murdered Rose, and not under sentence when he murdered James. The State responds that the contradiction is explained because the jury chose to extend clemency to Bollinger. The State emphasizes that the aggravating circumstances found by the jury supporting the death sentence rest on substantial evidence.
 

 We conclude that the State is correct. First, despite assertions in his reply brief, Bollinger provides no authority for the proposition that the concept of clemency with regard to inconsistent verdicts cannot apply in his case. The United States Supreme Court has held that no relief in federal cases is available on appeal based on inconsistent verdicts.
 
 See
 
 United States v. Powell, 469 U.S. 57, 64-68 (1984). In
 
 Powell
 
 the respondent argued that the jury could not properly have acquitted her of conspiracy to possess cocaine and possession of cocaine, and still found her guilty of using a telephone to facilitate the offenses.
 
 Id.
 
 at 60, 69. The Court rejected the argument, noting that “there is no reason to vacate respondent’s conviction merely because the
 
 *1117
 
 verdicts cannot rationally be reconciled. Respondent is given the benefit of her acquittal on the counts on which she was acquitted, and it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted.”
 
 Id.
 
 at 69. This reasoning also supported our conclusion in Brinkman v. State, 95 Nev. 220, 592 P.2d 163 (1979). There, the defendant was convicted of robbery without the use of a deadly weapon although uncontroverted evidence existed to convict him of armed robbery.
 
 Id.
 
 at 223, 592 P.2d at 165. We determined that the jury could have properly concluded as it did to extend a form of clemency.
 
 Id.
 
 We conclude that the rationale of these cases should apply in sentencing as well.
 

 Second, substantial evidence supports Bollinger’s death sentence. To be truly persuasive, Bollinger essentially must argue that he should have been given life for both murders, but that prejudicial evidence (namely, the tattoo) or confusion prompted the jury to render a death sentence for Rose’s murder. We conclude that the State is correct in arguing that the death penalty could have been justified in both cases, but that the jury decided to extend clemency in the case of James’ murder. In
 
 Brinkman
 
 this court concluded that “there was adequate evidence to convict appellant of the charged offense. He should not now be heard to complain that the jury saw fit to relieve him of the enhanced penalty.”
 
 Id.
 
 at 224, 592 P.2d at 165. In Bollinger’s case, aggravating factors were clearly present in both murders.
 

 CONCLUSION
 

 We conclude that Bollinger has shown neither undue prejudice nor application of jury instructions in an unconstitutional manner. Furthermore, Bollinger took steps to ensure that the jury understood that it could render different penalties for the murders of Rose and James. Bollinger asked the jury to extend mercy. The evidence indicates that Bollinger could easily have been sentenced to death on both counts of murder. The jury elected not to do so, rendering different penalties and extending a form of clemency. Bollinger should not now be heard to complain because the jury did what he asked. Accordingly, having considered all assignments of error, we conclude, pursuant to NRS 177.055(2), that (1) the evidence supports the finding of an aggravating circumstance or circumstances; (2) the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor; and (3) the sentence of death is not excessive, considering both the crime and the defendant. The judgment and sentence of death are affirmed.
 

 [1]
 

 Johnston’s name came up occasionally at trial. Although this shadowy character may have participated in the crimes, the State suggested that possibly only Bollinger committed the crimes. Indeed, police officers never found Johnston or proof of his existence.
 

 [2]
 

 We note that the Supreme Court of Utah, acting in its “supervisory capacity,” directed trial courts to discontinue use of the more weighty affairs language in defining reasonable doubt.
 
 Ireland,
 
 773 P.2d at 1380. Because the definition of reasonable doubt found in NRS 175.211 incorporates the more weighty affairs language, we feel that the task of discontinuing the use of this language in Nevada is best initiated by the legislature. Bollinger recommends the following definition of reasonable doubt endorsed by the Federal Judicial Center:
 

 [T]he government has the burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely true than not true. In criminal cases, the government’s proof must be more powerful than that. It must be beyond a reasonable doubt.
 

 Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant’s guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.
 

 Federal Judicial Center,
 
 Pattern Criminal Jury Instructions
 
 17-18 (1987) (instruction 21). We feel that adoption of such a definition would forestall future challenges to the more weighty affairs language of reasonable doubt jury instructions derived from NRS 175.211.