ROBERT PAUL SERVIN, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 35884

October 17, 2001

32 P.3d 1277

*Michael R. Specchio,* Public Defender, and *Cheryl D. Bond,* Deputy Public Defender, Washoe County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Richard A. Gammick,* District Attorney, and *Terrence P. McCarthy,* Deputy District Attorney, Washoe County, for Respondent.

# OPINION

By the Court, SHEARING, J.:

Appellant Robert Paul Servin and co-defendants Pedro Rodriguez and Brian Lee Allen murdered and robbed Kimberly Fondy on April 5, 1998. Servin and Rodriguez were tried together, convicted, and sentenced to death. Allen pleaded guilty to the murder and robbery charges, and a three-judge panel sentenced him to serve two consecutive prison terms of life without the possibility of parole.

Servin contends that a number of errors occurred in the district court, none of which, we conclude, warrant relief; therefore, we affirm the judgment of conviction. After a mandatory review of the death sentence pursuant to NRS 177.055(2), however, we conclude that the imposition of the death penalty is excessive, and vacate the sentence and impose two consecutive terms of life in prison without the possibility of parole.[1]

## FACTS

### I. Guilt phase

The following evidence was adduced at trial: on April 5, 1998, Servin, Rodriguez, and Allen set out to rob Kimberly Fondy of $35,000 reportedly kept in a safe in her house. Due to an accident which occurred when she was sixteen years old, Fondy was paralyzed below the mid-back and ambulated with the use of a wheelchair.

Sixteen years old at the time of the crime, Servin was the youngest of the three—Allen was seventeen years old, and Rodriguez was nineteen years old. According to Allen and several

---

[1] "The supreme court, when reviewing a death sentence, may: . . . [s]et aside the sentence of death and impose the sentence of imprisonment for life without possibility of parole." NRS 177.055(3)(c). The equal and consecutive sentence is mandated by NRS 193.165(1) based on the use of a deadly weapon.

witnesses, Rodriguez provided the information regarding the location of Fondy's house and the supposed existence of the money; he was the only one of the three who knew Fondy and had, at one time, lived with her at her Sparks residence. While living with Fondy, Rodriguez had a key to a safe that he believed contained a large amount of money. After ingesting the methamphetamine "crank" for a number of hours, and with Rodriguez behind the wheel, the three young men drove to Fondy's home armed with a shotgun provided by Servin and a .22 caliber revolver owned by Allen.

Allen testified to the following facts: during the drive to Fondy's home, Servin stated that he "was going to shoot her if he had to." Upon arrival, Rodriguez shut off the engine and waited in the car while Servin and Allen approached the front door, which Servin proceeded to kick open. The two men entered the home—Servin armed with the revolver owned by Allen, and Allen with the shotgun provided by Servin—and eventually found Fondy in her wheelchair in the master bedroom with a portable telephone in her hand. Servin told Joana Diaz later that night that "they didn't know who she was talking to."

Fondy was in the process of reporting the two intruders via a 9-1-1 emergency call when she was apparently confronted by Servin. Although her call was terminated before it was answered, the electronic taping system automatically started recording immediately after the initial dialing. Therefore, upon review of the tape of the 9-1-1 call and hang-up, the dispatcher was able to recognize a female voice whispering what sounded like, "There are two of them."

According to Allen, upon seeing Fondy with the phone in her hand, Servin pointed the revolver at her head, yelled at her to "shut up," grabbed the phone out of her hand, tossed it on the bed, and ordered her to get into the bathroom; Fondy repeatedly stated, "I'll give you the money." Servin also hit Fondy in the head so she would stop screaming. Meanwhile Rodriguez, wearing a black and white bandana covering his face except for his eyes, entered the home and found Fondy, Servin, and Allen in the master bedroom. Servin tried to block Fondy's view of Rodriguez so she would not be able to see and identify him—the only one of the three she knew.

Allen testified that Rodriguez immediately located Fondy's safe on a vanity shelf in the bedroom, even though it was hidden and disguised as furniture. Rodriguez tossed the safe into the hallway and ordered Allen to take it outside. According to Allen, he then returned to the car with the safe, leaving Servin and Rodriguez alone in the house with Fondy. Approximately two to three minutes later, Rodriguez returned to the car. Allen testified that soon

after that he heard four gunshots—two shots followed by two more shots after a couple of minutes. A neighbor of Fondy's testified that she heard ''a loud pop,'' and a few minutes later, the same loud sound again. Within minutes after the shooting, Servin returned to the car, and with Rodriguez again behind the wheel, the three young men drove away.

After stopping by the home of Servin and Allen to pick up some friends, all three resumed ingesting crank and proceeded to the residence of friends, Carlos and Joana Diaz. After some initial difficulty, Rodriguez managed to open the locked safe, and inside were miscellaneous papers, documents, and a baseball, but not the expected money. According to Joana Diaz, Rodriguez became angry and stated, ''This bitch lied. There is no money in here.'' Allen testified that he later took the safe from the Diaz home and tossed it in a nearby dumpster where it was eventually found.

According to Allen, Servin brought the revolver into the Diaz home; however, Emma Hernandez, Servin's girlfriend and the mother of his child, testified that when she first saw the revolver Allen was taking it out of his pants pocket, and that no one else handled it that night. Joana Diaz also testified that she first saw Allen with the revolver and that he was wearing a holster for it, but that both Servin and Rodriguez handled it during the night. Carlos Diaz testified that at the request of Allen, he flushed the two remaining bullets in the revolver down the toilet. Allen stated that later that evening, after leaving the Diaz home, he cleaned the revolver and buried it in his backyard; the revolver was eventually recovered by the police after Allen told them exactly where it was located. The shotgun was never recovered; in fact, aside from Allen's testimony, no evidence was presented that a shotgun was brought into Fondy's home.

At the Diaz home that night and the following morning, numerous inculpatory statements were made by the three men. Both Carlos and Joana Diaz testified that Servin, Rodriguez, and Allen were present when one of the three said that the bullets used in the shooting were dipped in either acid or mercury. Servin told Carlos Diaz that this was done in order to ''kill her a little slow or something,'' and Allen told Joana Diaz that it was done ''[s]o a person could die and make them suffer.'' Neither Servin, Rodriguez, nor Allen contradicted or corrected any of the statements made concerning the bullets or the commission of the crime.

Servin and Rodriguez were bragging about the crime during the night, and according to Allen, Servin admitted to shooting Fondy. Rodriguez told Emma Hernandez that they had shot her three or four times, and that ''[w]e did it, fool.'' According to several wit-

nesses, Servin was seen in possession of Fondy's cellular phone, Gameboy device, and $80 taken from her purse, and Rodriguez was seen in possession of Fondy's electronic organizer. Both Servin and Rodriguez at different times were in possession of a knife that Joana Diaz believed came from the Fondy residence; the knife was never recovered by the police. Rodriguez told Servin and Allen "not to say anything, because if they did, something was going to happen to them." Joana Diaz also testified that both Rodriguez and Servin threatened to kill anyone present at the Diaz home who spoke about the crime; Servin, referring to Allen, Rodriguez, Hernandez, and Carlos and Joana Diaz, reportedly stated that if anybody said anything that he would "smoke 'em." Rodriguez called Fondy's home at some point during the night to see if any police were there.

According to Joana Diaz, the following morning Rodriguez stated that he had difficulty sleeping because "he saw [Fondy's] eyes everywhere." Servin's brother, Fernando Machado, testified that after arriving at the Diaz home and hearing about the robbery and shooting, he asked Servin, Rodriguez, and Allen, "[w]hy didn't they just tie her up and then rob her. Why did they have to shoot her," to which there was no response. Machado also heard Rodriguez state that "if the first bullet didn't do it, the other one did," because it was mercury-tipped.

An autopsy performed the morning after the murder revealed that Fondy was shot once in the right shoulder, once in the right leg, and twice in the head; the two shots to the head were contact wounds indicating that the muzzle of the gun was in direct contact with the skin when the gun was fired. Additionally, the autopsy revealed that Fondy suffered various abrasions on her neck and chest and an incised wound on the top of her head, which indicated that a sharp, slicing cut was made across the skin. Dr. Roger S. Ritzlin testified that Fondy was alive when the wounds were inflicted; thus, in his opinion the evidence was consistent with the theory that the first two shots were non-lethal shots to Fondy's shoulder and leg and the second two shots were the lethal shots to her head. Other testimony established that Fondy did not appear to have any noticeable injuries to her neck, chest, or head earlier on the day she was murdered.

Servin and Rodriguez chose not to testify at their trial, and on October 18, 1999, the jury found them guilty of first degree murder and robbery, both with the use of a deadly weapon.

## II. *Penalty phase*

The penalty hearing began the following day, and both Servin and Rodriguez objected to the verdict forms, proposing instead the use of special verdict forms requiring that any mitigating circum-

stances found by the jury be specified in the same manner as the aggravating circumstances. The district court overruled the objections.

The State presented Cristi Weulfing, an intake assessment counselor with Washoe County Juvenile Services, who testified to her involvement with Servin in January of 1998. Weulfing testified that Servin was involved in a disturbance at a Sparks residence requiring the use of a SWAT team after Servin refused the requests of the Sparks Police to exit the home; he was subsequently charged with obstructing and resisting. The matter was resolved when Servin agreed to perform community service and attend a Homicide Intervention Panel, a one-hour class intended to educate "parents and kids, who are heading toward violence or possibly involved in violent situations, on the seriousness of homicide." Weulfing stated that Servin failed to appear; and, after rescheduling, Servin again failed to appear.

In mitigation, Servin presented Edward Burns, a teacher in the San Bernardino Unified School District (California), who testified to his relationship with Servin. For his seventh and eighth grade school years, Servin was a student in an Opportunity class taught by Burns, a program that provided a highly structured learning environment for students with academic and/or disciplinary problems. Burns described Servin as a follower and non-violent. Servin served as a teacher's assistant for Burns for one of their two years together, and Burns stated that he trusted Servin, his performance was excellent, and that he "was a calming influence in the class."

On cross-examination by the State, Burns admitted that he was not aware that Servin had ultimately been expelled from the school district. Burns further admitted that he was not aware of the twenty-seven referrals for disciplinary action involving Servin when he was a student at the middle school, or of the two suspensions for failing to follow school rules. Burns testified that he did not know Servin's parents, and that the school could not get either parent to attend school conferences.

Servin next presented Sandra Henley, an educational service coordinator with the San Bernardino Unified School District and formerly Servin's middle school vice-principal. She testified that Servin was a follower, very polite to staff, but received suspensions for "profanity, defiance, and not following the rules."

Servin exercised his right to allocution and stated:

> I'm sorry she died, and if you guys let me live, I may have a positive future. I want to finish my education, help young kids that took—that are leading their life in the wrong direction. . . . And as you guys know, I have a son out there, and so I ask you guys to please, I mean, let me live . . . . [E]ven

if I am in prison, I don't want to be, but at least let me see my son grow up. I mean, I feel bad for, I mean, the victim's son, because he ain't going to be able to see his mother. I mean, I feel bad because I've got a son of my own.

On October 20, 1999, the jury returned a verdict sentencing both Servin and Rodriguez to death after finding that there were no mitigating circumstances sufficient to outweigh the aggravating circumstances. With regard to Servin, the jury found five aggravating circumstances: (1) the murder was committed in the commission of the crime of robbery; (2) the murder was committed in the commission of the crime of burglary; (3) the murder was committed in the commission of the crime of home invasion; (4) the murder was committed to avoid or prevent a lawful arrest; and (5) the murder involved torture and/or mutilation of the victim.

On March 29, 2000, prior to sentencing, Servin stated to the district court, "I'm very sorry about Kimberly Fondy's death and all her family. I'm sorry about what happened to both of them. Also, I want to say that I don't think it's right for you guys to sentence me to death for a murder I did not commit."

The district court then sentenced Servin to death by lethal injection for first degree murder with the use of a deadly weapon (count I), and to serve two consecutive prison terms of 72 to 180 months for robbery with the use of a deadly weapon to run consecutively to count I. Servin was also ordered to pay restitution in the amount of $3,272.67, to be paid jointly and severally with Rodriguez.

A unanimous three-judge panel subsequently sentenced Allen to serve two consecutive prison terms of life without the possibility of parole for the murder charge (count I), and two consecutive prison terms of 72 to 180 months for the robbery charge to run consecutively to count I.

III.    *Post-trial motion*

On December 2, 1999, counsel for Servin filed a motion for a new trial based upon newly discovered evidence, and an evidentiary hearing was held in the district court. Servin contended that in the early morning hours of April 6, 1998, Allen told his friend Damien Winkelman that he had robbed and shot a woman twice in the head and once in the chest. Servin claimed that he was not made aware of this information until after his trial, on November 30, 1999, when his investigator was granted permission to interview Winkelman, who was incarcerated on an unrelated matter. Winkelman's counsel previously declined to permit an interview prior to the trial of Servin and Rodriguez.

The State opposed the motion and noted that in its formal

"Notice of Defendant Statements and Potentially Exculpatory Information," filed in the district court on January 19, 1999, nearly nine months prior to trial, the State included this information provided by Winkelman, who quoted Allen as saying, "Don't tell anyone, that's my life. I shot the bitch twice in the head and once in the chest, by that time, her eyes rolled back in her head." At the evidentiary hearing on the motion held on January 14, 2000, Winkelman testified and repeated what he claimed Allen had told him, that "[h]e shot her twice in the head, once in the chest. Before the second shot in her head, her eyes had already rolled back in her head." On March 14, 2000, the district court denied Servin's motion for a new trial.

## DISCUSSION

### I. Medical necessity and the manipulation of evidence

Servin contends that Allen's use of the anti-psychotic drug, Mellaril, altered his demeanor and made him appear calmer and more peaceful than usual thus effectively misleading the jury during his testimony. Allen's testimony was damaging to Servin; he was the only source naming Servin as the shooter of Fondy. The district court refused to grant Servin's request for an evidentiary hearing to determine whether the continued administration of anti-psychotic drugs to Allen was medically necessary; Servin sought to discover the precise dosages taken by Allen in order to present the information to the jury. Servin contends that the district court's inaction permitted the manipulation of evidence.

Servin's reliance on *Riggins v. Nevada*[2] in support of his contention is misplaced. In *Riggins,* the issue involved the involuntary medication of a defendant—the defendant sought to suspend the administration of Mellaril until after his trial in order to show the jury that his mental state was consistent with his insanity defense.[3] When examined to determine his competence to stand trial, Riggins was taking daily doses of Mellaril; two of the three court-appointed psychiatrists deemed Riggins competent.[4] The district court denied Riggins' motion, and this court affirmed his judgment of conviction and sentence of death, stating that expert testimony offered during the trial "was sufficient to inform the jury of the effect of the Mellaril on Riggins' demeanor and testimony."[5] The United States Supreme Court subsequently reversed

[2]504 U.S. 127 (1992).

[3]*Id.* at 130.

[4]*Id.* at 129-30.

[5]*Riggins v. State,* 107 Nev. 178, 181, 808 P.2d 535, 538 (1991).

and remanded the case stating that there was "a strong possibility that Riggins' defense was impaired due to the administration of Mellaril."[6]

Servin, in effect, asks this court to apply *Riggins* in an unprecedented manner. In a concurrence in *Riggins,* Justice Kennedy stated, "When the State commands medication during the pretrial and trial phases of the case for the avowed purpose of changing the defendant's behavior, the concerns are much the same as if it were alleged that the prosecution had manipulated material evidence."[7] Yet in this case, Allen was not a defendant at trial and was not forcibly medicated. As the State points out, while the district court refused to investigate the matter for Servin, it did not preclude the defense from conducting its own investigation and presenting that evidence at trial. Allen's counsel confirmed that Allen was prescribed and taking Mellaril on a voluntary basis. Therefore, just as this court stated in *Chapman v. State,*[8] regarding the known existence of audiotapes, Servin could have subpoenaed the attending physician's records, assessed them, and proffered at trial any information that he considered relevant to his defense. We conclude that Servin's contention that the district court erred by allowing the manipulation of evidence is without support.

## II.  *Reasonable doubt instruction*

Servin challenges the reasonable doubt instructions based on NRS 175.211 that were given at the guilt and penalty phases. Servin offered an alternate instruction on reasonable doubt that was rejected by the district court. He contends that the instruction given impermissibly reduced the State's burden of proof in violation of his due process rights.

We conclude that the district court did not err in relying on the mandatory statutory instruction.[9] This court has upheld the constitutionality of the instruction where, as here, the jury received additional instruction on the State's burden of proof and the presumption of innocence.[10]

## III.  *Narrowing function and death penalty eligibility*

Servin contends that at the penalty phase, NRS 175.552 per-

[6]*Riggins,* 504 U.S. at 137.

[7]*Id.* at 139.

[8]117 Nev. 1, 5-6, 16 P.3d 432, 435 (2001).

[9]*See* NRS 175.211(2).

[10]*See Middleton v. State,* 114 Nev. 1089, 1111-12, 968 P.2d 296, 311 (1998); *Bollinger v. State,* 111 Nev. 1110, 1115, 901 P.2d 671, 674 (1995).

mits evidence of aggravating circumstances beyond those outlined in NRS 200.033, and therefore nearly all offenders convicted of first degree murder are eligible for the death penalty. He argues that the statutory scheme provides little guidance and fails to constitutionally "narrow the class of persons eligible for the death penalty."[11]

This court recently addressed this issue in *Hollaway v. State*.[12] Three types of evidence are relevant at a death penalty hearing: "evidence relating to aggravating circumstances, mitigating circumstances, and 'any other matter which the court deems relevant to sentence.'"[13] In order to determine that a defendant is eligible for the death penalty, (1) the jury must unanimously find, beyond a reasonable doubt, at least one enumerated aggravating circumstance; and (2) each juror must then individually determine that mitigating circumstances, if any exist, do not outweigh the aggravating circumstances. At this point, a defendant is death-eligible, and the jury must consider all of the relevant evidence and unanimously decide on the sentence.[14] And it is only at this point (or if jurors do not find the defendant death-eligible) that jurors may consider "other matter" evidence under NRS 175.552 in deciding on the appropriate sentence.[15] Servin fails to demonstrate that the jury considered "other matter" evidence in violation of *Hollaway* in determining that he was eligible for the death penalty.

Servin also complains that NRS 200.033(9) is too broad,[16] but the jury actually rejected the aggravator, thereby performing the narrowing function that he argues does not occur. Because this aggravator was rejected by the jury and did not contribute to his sentence, we need not consider it further.[17] We conclude that the death penalty statutory scheme properly performed its narrowing function in this case, and that Servin's contention is without merit.

IV. *Juvenile death penalty*

Servin was sixteen years old when Fondy was murdered. NRS

---

[11]*Zant v. Stephens,* 462 U.S. 862, 877 (1983).

[12]116 Nev. 732, 6 P.3d 987 (2000).

[13]*Id.* at 745, 6 P.3d at 996 (quoting NRS 175.552(3)).

[14]*See id.* at 745-46, 6 P.3d at 996; *see also Evans v. State,* 117 Nev. 609, 28 P.3d 498 (2001); *Geary v. State,* 114 Nev. 100, 105, 952 P.2d 431, 433 (1998); NRS 200.030(4)(a); NRS 175.554(3).

[15]*Hollaway,* 116 Nev. at 746, 6 P.3d at 997.

[16]A murder is aggravated under NRS 200.033(9) if it "was committed upon one or more persons at random and without apparent motive."

[17]*See Wesley v. State,* 112 Nev. 503, 515, 916 P.2d 793, 801 (1996).

176.025 states that "[a] death sentence shall not be imposed or inflicted upon any person convicted of a crime now punishable by death who at the time of the commission of such crime was *under the age of 16 years.*" (Emphasis added.) Servin contends that sentencing a juvenile to death violates the International Covenant on Civil and Political Rights ("ICCPR"), a treaty ratified by the United States Senate in 1992.[18] Article 6(5) of the ICCPR states, *inter alia,* that a "[s]entence of death shall not be imposed for crimes committed by persons below eighteen years of age."[19]

When ratifying the treaty in 1992, the U.S. Senate, acting pursuant to its authority to provide "[a]dvice and [c]onsent,"[20] adopted the following reservation:

> That the United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age.[21]

This court was faced with the same issue in *Domingues v. State.*[22] Like Servin, Domingues argued that executing juvenile offenders violated the ICCPR. This court concluded "that the Senate's express reservation of the United States' right to impose a penalty of death on juvenile offenders negates Domingues' claim that he was illegally sentenced."[23] In support of its conclusion, this court also noted that the United States Supreme Court in *Stanford v. Kentucky*[24] upheld the constitutionality of imposing death on juvenile offenders.[25]

The United States Supreme Court has yet to grant certiorari in a case that raises arguments challenging the Senate's reservation and its effect on states with statutes such as NRS 176.025.[26] In

---

[18]*See* ICCPR, *opened for signature* Dec. 19, 1966, S. Treaty Doc. No. 95-2, 999 U.N.T.S. 171 (1976).

[19]*Id.* at art. 6, para. 5, 999 U.N.T.S. at 175.

[20]U.S. Const. art. II, § 2, cl. 2.

[21]138 Cong. Rec. 8070 (1992); *see also* S. Exec. Rep. No. 23, 102d Cong., 2d Sess. 21-22 (1992).

[22]114 Nev. 783, 961 P.2d 1279 (1998), *cert. denied,* 528 U.S. 963 (1999).

[23]*Id.* at 785, 961 P.2d at 1280.

[24]492 U.S. 361 (1989).

[25]*Domingues,* 114 Nev. at 785-86, 961 P.2d at 1280.

[26]As of this year, 38 states allow for the imposition of the death penalty (including states respecting a moratorium on its application). Of these, eighteen states set the minimum age for death penalty eligibility at 16 years:

fact, the Supreme Court denied certiorari in *Domingues* after requesting a brief from the Solicitor General,[27] who, in turn, argued that Domingues' writ petition should be denied.[28] Furthermore, to date, not one state or federal court has adopted the reasoning that Domingues and now Servin have asked this court to adopt.[29] Therefore, we conclude that executing juvenile offenders pursuant to NRS 176.025 does not violate the ICCPR and that Servin's contention is without merit.

## V.  *Aggravating circumstances*

### *Duplicative aggravators*

Servin contends that a defendant cannot be convicted of both burglary and home invasion, and therefore, relying on *Lane v. State,*[30] he argues that the State should have been precluded from presenting both as aggravators for consideration at sentencing.[31] We conclude that the aggravating circumstances of burglary and home invasion are duplicative.

Convictions for both burglary and home invasion do not fail the test articulated by the Supreme Court in *Blockburger v. United States*[32] for determining whether two separate offenses exist for double jeopardy purposes.[33] Pursuant to Blockburger, a defendant

Alabama, Arizona, Arkansas, Delaware, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Nevada, Oklahoma, Pennsylvania, South Carolina, South Dakota, Utah, Virginia, and Wyoming. Five states set the minimum age at 17 years: Florida, Georgia, New Hampshire, North Carolina, and Texas. Fifteen states set the minimum age at 18 years: California, Colorado, Connecticut, Illinois, Kansas, Maryland, Montana, Nebraska, New Jersey, New Mexico, New York, Ohio, Oregon, Tennessee, and Washington. *See* Victor L. Streib, *The Juvenile Death Penalty Today: Death Sentences and Executions for Juvenile Crimes, January 1, 1973—December 31, 2000* (February 2001), *available at* http://www.law.onu.edu/faculty/streib/juvdeath.htm.

[27]*Domingues v. Nevada,* 526 U.S. 1156 (1999).

[28]Brief for the United States as Amicus Curiae, *Domingues v. Nevada* (No. 98-8327).

[29]In the recent case of *Beazley v. Johnson,* the United States Court of Appeals for the Fifth Circuit cited *Domingues* and agreed with its conclusion that the Senate's reservation to Article 6(5) of the ICCPR was valid. 242 F.3d 248, 266-67 (5th Cir. 2001), *petition for cert. filed, available at* Supreme Court of the United States, http://www.supremecourtus.gov/docket/00-10618.htm (U.S. June 13, 2001) (No. 00-10618).

[30]114 Nev. 299, 956 P.2d 88 (1998).

[31]*See* NRS 200.033(4).

[32]284 U.S. 299 (1932); *see also Barton v. State,* 117 Nev. 686, 30 P.3d 1103 (2001) (adopting *Blockburger* test for determining lesser-included offenses).

[33]*See McIntosh v. State,* 113 Nev. 224, 225, 932 P.2d 1072, 1073 (1997) (stating that Nevada follows the double jeopardy test set forth in *Blockburger*).

may not be convicted of two offenses premised on the same facts unless each offense "requires proof of a fact which the other does not."[34]

The offense of burglary requires proof that the defendant entered a building, vehicle, or other enumerated location "with the intent to commit grand or petit larceny, assault or battery on any person or any felony."[35] On the other hand, the offense of home invasion does not necessitate the showing of entry with a specific intent to commit a crime.[36] Rather, a defendant is guilty of home invasion if the defendant commits a forcible entry of an inhabited dwelling without permission of the owner, resident, or lawful occupant.[37] Therefore, each offense requires proof of an element that the other does not. Here, the evidence supports the finding of burglary in that Servin entered a building in order to commit the felony of robbery. The evidence also supports the finding of home invasion in that Servin forcibly kicked open the door to Fondy's residence without her permission.

Nevertheless, we hold here that a strict *Blockburger* analysis does not necessarily determine whether multiple aggravating circumstances in support of a death sentence are improperly duplicative. In *Geary v. State*,[38] we concluded that an aggravator based on Geary's parole status when he committed murder and another aggravator based on a prior murder conviction which gave rise to his parole were not duplicative because they addressed different state interests: one was directed at those who commit murder after receiving the privilege of parole, the other at those who are repeat offenders. Unlike in *Geary,* we discern no separate interests advanced by permitting burglary and home invasion to be considered as separate aggravators in this case. In *Geary,* the prior murder conviction was distinct from, even though it provided the opportunity for, the parole. Here, however, despite the different elements which burglary and home invasion require in the abstract, the actual conduct underlying both aggravators was identical. This court's reasoning in invalidating redundant convictions is pertinent. In such a case, we consider

whether the gravamen of the charged offenses is the same

---

[34]284 U.S. at 304.

[35]NRS 205.060(1).

[36]*See* NRS 205.067(1).

[37]*Id.*

[38]112 Nev. 1434, 1448, 930 P.2d 719, 728 (1996), *clarified on rehearing,* 114 Nev. 100, 952 P.2d 431.

such that it can be said that the legislature did not intend multiple convictions. . . . The question is whether the material or significant part of each charge is the same even if the offenses are not the same. Thus, where a defendant is convicted of two offenses that, as charged, punish the exact same illegal act, the convictions are redundant.[39]

Likewise, we hold that it is improper to find the aggravating circumstance of burglary and the aggravating circumstance of home invasion under NRS 200.033(4) when both are based on the same facts. Accordingly, we conclude that the aggravating circumstance of home invasion is duplicative and invalid.

### Torture

Servin contends that there was insufficient evidence to support the aggravating circumstance of torture. He argues that neither the number of shots nor the lapse of time between the shots that killed Fondy indicated an intent to inflict pain beyond the act of killing.[40] Furthermore, Servin notes that the forensic examiner was unable to pinpoint the time when the victim's abrasions were sustained other than deducing that they occurred within 48 hours of her death.

We conclude that the evidence is sufficient to support the finding of torture as an aggravator under NRS 200.033(8). A finding of torture "requires that the murderer must have intended to inflict pain beyond the killing itself."[41] Further, "[t]orture involves a calculated intent to inflict pain for revenge, extortion, persuasion or for any sadistic purpose."[42] NRS 200.033(8) does not expressly require that each defendant individually torture the victim.[43]

Trial testimony made it clear that Fondy appeared uninjured the morning of the murder. Servin admitted to those present at the Diaz home after the crime that he hit Fondy over the head, and the abrasions and incised head wound noted during the autopsy would have been visible if they had occurred earlier. It is unlikely that the wounds were incidental to a struggle because Fondy, from

---

[39]*State of Nevada v. Dist. Ct.,* 116 Nev. 127, 136, 994 P.2d 692, 698 (2000).

[40]*See Domingues v. State,* 112 Nev. 683, 702, 917 P.2d 1364, 1377 (1996).

[41]*Id.*

[42]*Id.* at 702 n.6, 917 P.2d at 1377 n.6.

[43]*See Byford v. State,* 116 Nev. 215, 240, 994 P.2d 700, 717, *cert. denied,* 531 U.S. 1016 (2000).

her wheelchair, was hardly able to raise much of a defense or pose a physical threat to her attackers. Therefore, there was little reason, other than to persuade her to open the safe or to indulge sadistic urges, for the beating she suffered or for the two non-lethal gun shots, one of which struck one of her paralyzed legs. Additionally, Servin was bragging about the murder later that evening, and he was aware of and present when the discussion centered on how the bullets were dipped in either acid or mercury in order to make Fondy's death slow and painful.[44] These facts highlight Servin's sadistic mental state.

## VI. *Servin's motion for a new trial*

As discussed in the fact section above, the district court denied Servin's motion for a new trial based upon newly discovered evidence. Servin continues to argue on appeal that the information that Winkelman provided after the trial relating to alleged inculpatory statements made to him by Allen qualifies as newly discovered evidence pursuant to NRS 176.515.[45] Servin contends that Allen was so important a witness that his impeachment would necessitate a different verdict.[46] Servin further contends that he was precluded from adequately investigating the potential testimony of Winkelman by Supreme Court Rule 182.[47] We conclude that Servin's contention that Winkelman's information was newly discovered evidence is belied by the record, and that Servin was not precluded from subpoenaing Winkelman to testify at trial.

Evidence qualifies as newly discovered if "it could not have been discovered and produced for trial even with the exercise of reasonable diligence."[48] In its "Notice of Defendant Statements and Potentially Exculpatory Information," filed nearly nine months prior to trial, the State disclosed that Winkelman quoted Allen as saying, " 'Don't tell anyone, that's my life. I shot the bitch twice in the head and once in the chest, by that time, her eyes rolled back in her head.' "

---

[44]No evidence was presented by the State indicating that the bullets were actually dipped in any substance.

[45]NRS 176.515(1) states that "[t]he court may grant a new trial to a defendant if required as a matter of law or on the ground of newly discovered evidence."

[46]*See Hennie v. State,* 114 Nev. 1285, 1290, 968 P.2d 761, 764 (1998) (stating that new trial should be granted "if the witness impeached is so important that impeachment would necessitate a different verdict").

[47]SCR 182 states that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

[48]*Callier v. Warden,* 111 Nev. 976, 988, 901 P.2d 619, 626 (1995).

"The grant or denial of a new trial on [the ground of newly discovered evidence] is within the trial court's discretion and will not be reversed on appeal absent its abuse."[49] As noted above, the district court held an evidentiary hearing on the motion and ultimately held that the evidence in question was not newly discovered. We conclude that the district court did not err in denying Servin's motion for a new trial.

VII.   *Mandatory review*

NRS 177.055(2) requires this court to review every death sentence and consider in addition to any issues raised on appeal:

> (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
> (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
> (d) Whether the sentence of death is excessive, considering both the crime and the defendant.

First; the jurors found five aggravating circumstances, four of which, we conclude, are well founded: (1) the murder was committed in the commission of the crime of robbery; (2) the murder was committed in the commission of the crime of burglary; (3) the murder was committed to avoid or prevent a lawful arrest; and (4) the murder involved torture and/or mutilation of the victim. As discussed above, we conclude that a fifth aggravator, that the murder was committed in the commission of the crime of home invasion, is invalid.

Second, Servin contends that the jury's rejection of any mitigating circumstances demonstrates the sentence's unreliability and that it was imposed under the influence of passion and prejudice. This argument is without support—the jury was not asked to detail its findings concerning mitigating circumstances. As noted above, the district court rejected Servin's proposed special verdict form requesting that any mitigating circumstances found by the jury be specified in the same manner as the aggravating circumstances. We conclude that the district court did not err. States may structure a sentencer's consideration of mitigating circumstances so long as the consideration of relevant mitigating circumstances is not precluded.[50] Furthermore, the sentencer is not constitutionally

---

[49]*Sanborn v. State,* 107 Nev. 399, 406, 812 P.2d 1279, 1284 (1991).

[50]*See Buchanan v. Angelone,* 522 U.S. 269, 276 (1998).

or statutorily required to make specific findings.[51] Therefore, we conclude that Servin's argument is without merit, and that the record on appeal does not reveal that the sentence was imposed under the influence of passion or prejudice.

Third, Servin contends that his death sentence is excessive and disproportionate considering that Allen was the beneficiary of significant mercy in receiving a sentence of life without the possibility of parole. NRS 177.055(2)(d) no longer requires proportionality review as part of the excessiveness analysis.[52] Furthermore, this court has specifically declined to engage in a proportionality review of death sentences.[53] Rather, the question to be asked is: "are the crime and defendant before us on appeal of the class or kind that warrants the imposition of death?"[54] With this in mind, we turn to Servin. We conclude, upon analysis, that the imposition of the death penalty in this case is excessive.

The evidence is clear that Servin participated in a horrible crime. However, the quality of the evidence against Servin as the shooter is problematical. Allen pleaded guilty, thereby escaping the death penalty. Allen testified before his own sentencing and is the sole witness to identify Servin as the shooter and the provider of a weapon. Allen's testimony on these points is without corroboration. It is possible that Allen himself was the shooter. The murder weapon belonged to Allen, and Damien Winkelman quoted Allen as saying, "Don't tell anyone, that's my life. I shot the bitch twice in the head and once in the chest, by that time, her eyes rolled back in her head." There is no evidence that Servin provided the murder weapon, and only Allen places the murder weapon in Servin's hands during the commission of the crime.

Servin had not yet reached the age of majority and was sixteen years old at the time of the murder; his youth has significant value as a mitigating factor pursuant to NRS 200.035(6).[55] He was the

---

[51]*See* NRS 175.554(4); *Rook v. Rice,* 783 F.2d 401, 407 (4th Cir. 1986); *see also Rogers v. State,* 101 Nev. 457, 469, 705 P.2d 664, 672 (1985) (rejecting claim that district court erred by not providing jury with form or method for setting forth findings of mitigating circumstances).

[52]*See* 1985 Nev. Stat., ch. 527, § 1, at 1597 (amending NRS 177.055(2)(d) to repeal the proportionality review requirement).

[53]*See, e.g., Guy v. State,* 108 Nev. 770, 784, 839 P.2d 578, 587 (1992); *see also Dennis v. State,* 116 Nev. 1075, 1084, 13 P.3d 434, 440 (2000) (recognizing that the penalties imposed in other capital cases are irrelevant to the excessiveness determination).

[54]*Dennis,* 116 Nev. at 1085, 13 P.3d at 440.

[55]Although a death sentence is permissible under NRS 176.025, committing the murder at sixteen years old, Servin was the youngest anyone could be in Nevada and receive a death sentence.

youngest of the three involved in the crime. It is undisputed that Rodriguez, nineteen years old at the time, was the instigator. Further contributing to the excessiveness determination, Servin's background did not include a significant criminal history, he expressed remorse for his actions, and he was under the influence of methamphetamine throughout the robbery and murder. Taking all these factors into account, we are persuaded that the imposition of the death penalty against Servin is excessive. We therefore vacate the sentence of death and impose two consecutive terms of life in prison without the possibility of parole.

## CONCLUSION

For the reasons discussed above, we affirm the judgment of conviction, vacate the sentence of death, and impose two consecutive terms of life in prison without the possibility of parole. We remand this case for the limited purpose of entering an amended judgment of conviction consistent with this opinion.

AGOSTI and BECKER, JJ., concur.

ROSE, J., concurring:

I concur with the majority's conclusion that the death penalty was excessive when applied to Servin, but I believe that an additional ground for ruling out the death penalty for this minor is that customary international law precludes the most extreme penalty for juvenile offenders.

At first blush, the U.S. Senate's reservation to the International Covenant on Civil and Political Rights (ICCPR) seems completely incompatible with the object and purpose of the treaty. However, three factors convince me that the Senate's reservation has continued viability. First, the ICCPR does not expressly prohibit reservations or make reference to the object-and-purpose test. Second, it is reported that there is a "widespread state practice in support of reservations to human rights treaties" and that "approximately one-third of the parties to the ICCPR made reservations to over a dozen substantive provisions."[1] Third, while 11 of the 146 nations objected to the Senate's reservation because it violated the basic purpose of the treaty, none of the objections were raised within the twelve months after the communication of the United States' reservation, and therefore, the reservation is deemed accepted under the Vienna Convention. This court has carefully considered the effect of the Senate reservation as I was concerned about in *Domingues v. State*[2] and I am gratified that we have fully addressed this important issue.

---

[1] Curtis A. Bradley & Jack L. Goldsmith, *Treaties, Human Rights, and Conditional Consent,* 149 U. Pa. L. Rev. 399, 433 (2000).

[2] 114 Nev. 783, 961 P.2d 1279 (1998).

This is not the end of the hunt in the international law arena, however, because Servin also argues that assessing the death penalty upon juveniles violates an international customary law norm. His argument is that a proposition becomes so accepted among a great many nations that it becomes an international law norm, and therefore, should be recognized as customary international law and bind all nations. Two of the legal authorities who argue such a position are Professor Harold Koh and Professor Louis Henkin.

Professors Koh and Henkin contend that customary international law is federal law and supercedes state law that is inconsistent. "Once customary norms have sufficiently crystallized, courts should presumptively incorporate them into federal common law, unless" federal directives specifically oust the norm.[3] Without contrary federal directives, bona fide rules of customary international law become federal law unless the United States affirmatively protested the norm before the norm matured.[4]

Several commentators make persuasive arguments that it is customary international law that juveniles should not be executed.[5] "[T]here is an emerging customary international law under which capital punishment of juveniles is prohibited."[6] Indeed, there appears to be overwhelming support among the majority of nations to ban the imposition of the death penalty for juvenile offenders.[7] Notably, this support appears to be influencing several states within the United States to also ban the death penalty for juveniles.[8]

While there are other respected legal authorities that reach the contrary conclusion,[9] I am persuaded that banning the execution

---

[3]Harold Hongju Koh, *Is International Law Really State Law?*, 111 Harv. L. Rev. 1824, 1835 (1998).

[4]*See* F. Giba-Matthews, *Customary International Law Acts as Federal Common Law in U.S. Courts*, 20 Fordham Int'l L.J. 1839, 1854 (1997).

[5]*See* James F. Hartman, *'Unusual' Punishment: The Domestic Effects of International Norms Restricting the Application of the Death Penalty*, 52 U. Cin. L. Rev. 655, 669-82 (1983); Louis Henkin, *International Law: Politics and Values* 189 (1995) (noting that a number of the rights protected by the ICCPR have become customary international law); Ved P. Nanda, *The United States Reservation of the Ban on the Death Penalty for Juvenile Offenders: An Appraisal Under the International Covenant on Civil and Political Rights*, 42 Depaul L. Rev. 1311, 1328-33 (1993); David Weissbrodt, *Execution of Juvenile Offenders by the United States Violates International Human Rights Law*, 3 Am. U. J. Int'l & Pol'y 339, 357-69 (1988).

[6]Nanda, *supra* note 5, at 1328.

[7]*See Stanford v. Kentucky*, 492 U.S. 361, 390 (1989) (Brennan, J., dissenting).

[8]*See* Pamela Brogan, *Moves to ban death penalty for juveniles gain momentum*, Reno Gazette-Journal, Sept. 12, 2001, at 14A.

[9]*See* Bradley & Goldsmith, *supra* note 1, at 426-27 (concluding that the

of juveniles is a customary international norm and this ban should be recognized as binding on the United States. In my view, this is an additional reason to reduce Servin's penalty to life imprisonment without the possibility of parole.

MAUPIN, C. J., concurring and dissenting:

I would not impose a lesser sentence at this point. Rather, I would remand for a new sentencing hearing so that the jury can hear evidence from both Allen and Winkelman and determine which of these witnesses to believe. If the jury believes Allen over Winkelman, sentencing Servin to death is not excessive.

I recognize that this would amount to granting Servin relief on direct appeal from the ineffective assistance of his trial counsel, with regard to the failure to take measures to at least produce Winkelman's evidence during trial proceedings. In my view, counsel's failure to do so would inevitably lead to post-conviction relief. Thus, rather than delay the inevitable, we should solve this problem now.

Accordingly, I would not eliminate the option of a death sentence for Servin at this juncture.

LEAVITT, J., with whom YOUNG, J., agrees, concurring in part and dissenting in part:

I agree with the majority that the judgment of conviction should be affirmed, but respectfully disagree that this court should vacate the sentence of death and impose a sentence of life without the possibility of parole.

The majority concludes the death penalty is excessive in this case because: the testimony of an accomplice, Allen, lacks corroboration; Servin was only sixteen years old at the time of the crime; he lacked a significant criminal history; he expressed remorse; and, he was under the influence of methamphetamine throughout the robbery and murder.

All of these factors were considered by the jury who determined that the proper punishment in this case is death.

*Corroboration of accomplice's testimony*

"The evidence necessary to corroborate an accomplice need

---

provision of the ICCPR with respect to which the United States has attached reservations is not binding customary international law); *see also* Curtis A. Bradley & Jack L. Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position,* 110 Harv. L. Rev. 815, 849-870 (1997) (concluding that customary international law should not be treated as federal law and binding on the states in the absence of authorization from the federal political branches).

not in itself be sufficient to establish guilt."[1] It is sufficient if the jury is convinced the accomplice has sworn truly and that the charge is true.[2] The evidence "may be slight in probative effect, yet its weight is for the jury, and if it tends to connect the accused with the commission of the offense, it . . . satisf[ies]" the requirement that an accomplice's testimony must be corroborated.[3]

Here, Servin's friend, Joana Diaz, testified that Servin told her that the victim was using the phone when he found her in the master bedroom, and that he told her to "shut up," grabbed the phone out of her hand and hit her on the head so she would stop screaming. Joana Diaz also testified that Servin threatened to kill anyone who spoke about the crime. Emma Rosa Hernandez, the mother of Servin's son, testified Servin was in possession of the victim's cellular phone, Gameboy device, and $80 taken from the victim's purse. She also testified that Rodriguez told her he was outside the home when the shooting took place. This evidence was weighed by the jury and the jury determined it was sufficient to meet the test of corroborating Allen's testimony that Servin was the person who did the actual shooting of the victim.

The majority states, "It is possible, if not likely, that Allen was the shooter," and relies upon a statement by Damien Winkelman filed in the case by the State nearly nine months prior to trial and disclosed to defense counsel. The district court rejected this evidence as grounds for a new trial and I agree with the majority in affirming the district court's decision. The statement was not before the jury that imposed the penalty and it is improper to invade the province of the jury by speculating as to possibilities. The only evidence presented to the jury was that Servin was the shooter.

*Age of the defendant*

The legislature has decided that the death penalty may not be imposed upon any person who at the time of the commission of the crime was under the age of 16 years.[4] This court considered

---

[1]*State v. Hilbish Et. Al.,* 59 Nev. 469, 479, 97 P.2d 435, 439 (1940); *State v. Streeter,* 20 Nev. 403, 405-06, 22 P. 758, 759 (1889).

[2]*Streeter,* 20 Nev. at 406, 22 P. at 759.

[3]*Hilbish,* 59 Nev. at 479, 97 P.2d at 439.

[4]NRS 176.025 reads:

A death sentence shall not be imposed or inflicted upon any person convicted of a crime now punishable by death who at the time of the commission of such crime was under the age of 16 years. As to such person, the maximum punishment that may be imposed shall be life imprisonment.

the imposition of the death penalty upon a sixteen year old defendant in *Domingues v. State*[5] and concluded that the execution of juvenile offenders does not violate the International Covenant on Civil and Political Rights, a treaty ratified by the United States in 1992. The majority in affirming the judgment of conviction here points out that the United States Supreme Court has upheld the constitutionality of inflicting the death penalty on juvenile offenders.[6] Since our decision in *Domingues* the legislature has met twice and has chosen not to increase the age of death eligibility.

This court should not use the age of a defendant as a reason to reduce the punishment to life imprisonment without the possibility of parole when the jury rejected age as a reason for a lesser punishment and when the legislature has declined to increase the age requirement.

The majority also mentions Servin is the youngest of the three charged in the offense. Rodriguez was nineteen years old and Allen was seventeen years old at the time of the crime. The jury sentenced Rodriguez to death and this court upheld the conviction and sentence although all of the evidence in the case indicates Rodriguez was outside when the shooting took place.

### Lack of criminal history and remorse

Although Servin did not have an extensive criminal history, testimony was presented concerning a charge of obstructing and resisting wherein a SWAT team was required to remove him from his home. There was other evidence showing Servin received twenty-seven referrals for disciplinary action while a middle school student and he was ultimately expelled from the school district.

The only remorse expressed in allocution by Servin was, "I'm sorry she died" and that he felt bad for the victim's son "because he ain't going to be able to see his mother. I mean, I feel bad because I've got a son of my own." The jury observed Servin when he made his statement in allocution and apparently gave it little credence or weight.

### Under the influence of methamphetamine

One of the reasons given by the majority to reduce the penalty in this case is that Servin "was under the influence of methamphetamine throughout the robbery and murder."

The ingestion of methamphetamine was a voluntary act by Servin and his drugged condition does not lessen his criminal culpability for the brutal robbery and murder. Instead, the fact that

---

[5]114 Nev. 783, 786, 961 P.2d 1279,1280 (1998).

[6]*Stanford v. Kentucky,* 492 U.S. 361 (1989).

he was under the influence of an illegal substance aggravates the offense.

## Whether the death penalty is excessive

The majority concludes the death penalty is excessive in this case. The test for excessiveness is whether the crime and defendant are of the class or kind that warrant the death penalty.[7]

This case involves a trio of young men who set out to rob the victim of $35,000 she supposedly kept in a safe in her home. The three men drove to the victim's home armed with a .22 caliber revolver and a shotgun. During the drive to the victim's home Servin said that he "was going to shoot her if he had to." Servin entered the house armed with the revolver.

The victim in this case, was paralyzed from her mid back down and required the use of a wheel chair. During the crimes, she suffered various abrasions on her neck and chest and a wound to the top of her head, which indicated that a sharp, slicing cut was made across the skin. She was shot once in the right shoulder, once in the right leg, and twice in the head. The shots to the head were contact wounds indicating that the muzzle of the revolver was in direct contact with the skin when the gun was fired. Testimony indicated that the first two shots, to the shoulder and leg, were non-lethal and that the victim was alive when the wounds were inflicted. There was testimony the bullets used in the shooting were dipped in either acid or mercury in order to make the victim suffer. The fatal two shots to the head were done execution style.

After the shooting Servin bragged about the crime and threatened to kill anyone who spoke about it. Servin stated "if anyone says anything, we'll smoke 'em." When asked by his brother "[w]hy didn't they just tie her up and then rob her. Why did they have to shoot her," there was no response.

All of these facts reveal Servin's sadistic mental state and desire to torture the victim. The case is certainly one where the defendant and the crime warrant the death penalty.

Accordingly, I would affirm both the judgment of conviction and the sentence of death.

---

[7]*Dennis v. State,* 116 Nev. 1075, 1084-85, 13 P.3d 434, 440 (2000).